886 F.2d 662
 30 ERC 1468, 58 USLW 2195, 20 Envtl.
L. Rep. 20,182
 GEO-TECH RECLAMATION INDUSTRIES, INC., a West Virginia
Corporation; Marvin C. Miller, an individual; LCS
Services, Inc., a West Virginia Corporation; Frank L.
Corrado, an individual; Joseph J. Corrado, an individual,
Richard Vaughan Lenzi, an individual; Lee Snyder, an
individual, Plaintiffs-Appellees,
v.
J. Edward HAMRICK, III, Director, West Virginia Department
of Natural Resources; David W. Robinson, Chief, Division of
Water Resources of the West Virginia Department of Natural
Resources; B. Douglas Steele, Chief, Division of Hazardous
and Solid Waste Management of the West Virginia Department
of Natural Resources; Citizens to Fight North Mountain
Waste Site, Defendants-Appellants.
Carl CROOKS, Jr., Plaintiff-Appellee,
v.
J. Edward HAMRICK, III, Director, West Virginia Department
of Natural Resources; David W. Robinson, Chief, Division of
Water Resources of the West Virginia Department of Natural
Resources; B. Douglas Steele, Chief, Division of Hazardous
and Solid Waste Management of the West Virginia Department
of Natural Resources; Gaston Caperton, Governor of the
State of West Virginia, Defendants-Appellants.
 Nos. 89-2021, 89-2022.
 United States Court of Appeals,
Fourth Circuit.
 Argued July 10, 1989.
Decided Sept. 25, 1989.
 
 Jennifer Joy Costello, Sr. Asst. Atty. Gen. (Charles G. Brown, Atty. Gen. on brief); Susan Renee Snowden (Martin & Seibert, Martinsburg, W.Va., on brief), for defendants-appellants.
 James Ronald Snyder (Jackson & Kelly, Charleston, W.Va., on brief), Thomas H. Vanderford, IV, Charleston, W.Va., (Martin C. Miller, Frank L. Corrado, Kew Gardens, N.Y., Joseph J. Corrado, Richard Vaughan Lenzi, Lee Snyder on brief), for plaintiffs-appellees.
 Before ERVIN, Chief Judge, and PHILLIPS and WILKINSON, Circuit Judges.
 ERVIN, Chief Judge:
 
 
 1
 In this consolidated appeal, several West Virginia state environmental officials (collectively "West Virginia") and an organization known as "Citizens to Fight North Mountain Waste Site" appeal from determinations on summary judgment that a provision of West Virginia's Solid Waste Management Act, W.Va.Code Sec. 20-5F-4(b), is facially unconstitutional. Because we find that the statutory language in question bears no rational relation "to the public health, safety, morals or general welfare," we must affirm the decision below.
 
 I.
 A.
 
 2
 West Virginia, like many other states, has enacted a statutory scheme governing solid waste disposal. In accordance with the provisions of the state's Solid Waste Management Act ("the Act"), W.Va.Code Secs. 20-5F-1 to 20-5F-8 (Supp.1989), landfills are regulated by the Department of Natural Resources ("the Department"). The Act flatly prohibits the operation of open dumps and requires landfill operators to obtain a permit from the Department before constructing, operating, or abandoning any solid waste disposal facility. W.Va.Code Sec. 20-5F-5. Permits may be issued by the Department's Director, after notice and opportunity for a public hearing, and may contain reasonable terms and conditions for the operation of a proposed waste facility. W.Va.Code Sec. 20-5F-4(b). Among the various reasons for which a permit may be denied,
 
 
 3
 the director may deny the issuance of a permit on the basis of information in the application or from other sources including public comment, if the solid waste facility may cause adverse impacts on the natural resources and environmental concerns under the director's purview in chapter twenty of the Code, destruction of aesthetic values, destruction or endangerment of the property of others or is significantly adverse to the public sentiment of the area where the solid waste facility is or will be located.
 
 
 4
 W.Va.Code Sec. 20-5F-4(b). It is the final clause of this section--giving the Director authority to deny a permit solely because it is "significantly adverse to the public sentiment"--which is at issue in this case.[1]
 
 B.
 
 5
 The facts relevant to this consolidated appeal are undisputed and straightforward. Geo-Tech Reclamation Industries, Inc. ("GRI") and LCS Services, Inc. ("LCS"), desire to operate a landfill on a site in West Virginia's panhandle country near the North Mountain community. GRI obtained an option to purchase the 331 acre site in 1986 and subsequently filed an application for a landfill operating permit. Its application was denied by the Director of the Department of Natural Resources on the ground that the proposed landfill had engendered "adverse public sentiment." The Director's letter terminating the permit application process stated:
 
 
 6
 the Department has received approximately 250 letters representing individual citizens, businesses, and groups in the Hedgesville area. All are vehemently opposed to the project. We have also received a petition in which similar feelings were expressed by many more hundreds of local citizens ... Due to the significant concern voiced by the residents of the area, I believe it is inappropriate to continue further technical review and am denying the permit application on the basis of adverse public sentiment, as prescribed in Sec. 20-5F-4(b). The staff review of the Part I application has not revealed any insurmountable technical problems with the site.
 
 
 7
 (Record p. 63)
 
 
 8
 Subsequently, LCS acquired an option to purchase the site in 1987. Its application to operate a solid waste disposal facility was also rejected because of adverse public sentiment. In his letter denying LCS' permit application, however, the Director added "destruction of aesthetic values, and the destruction and endangerment of the property of others" as further reasons for the denial. LCS appealed the decision to the West Virginia Water Resources Board pursuant to W.Va.Code Sec. 20-5F-7. During hearings before the Board, Robert D. Seip, a former Department employee who supervised the technical review of LCS' application, testified that LCS' site was particularly well suited to serve as a landfill and that LCS' plan had no significant technical failings. Based in part on this testimony, the Board ruled that neither aesthetic or property value related concerns would justify the denial of LCS' application. It affirmed, though, the Director's decision on the basis of adverse public sentiment.
 
 
 9
 After the State Water Resources Board upheld the Director's decision, LCS and GRI brought declaratory judgment actions challenging Sec. 20-5F-4(b)'s constitutionality. LCS and GRI argued that Sec. 20-5F-4(b) violated due process by impermissibly delegating legislative authority to local citizens. They also argued that the statute exceeded the state's police power. On cross motions for summary judgment, the district court found Sec. 20-5F-4(b) to be unconstitutional. Relying on decisions by the Supreme Court in Eubank v. City of Richmond, 226 U.S. 137, 33 S.Ct. 76, 57 L.Ed. 156 (1912) and Washington Ex Rel. Seattle Title Trust Co. v. Roberge, 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210 (1928), the court accepted the plaintiffs' argument that "this provision is on its face violative of due process rights guaranteed under the United States Constitution insofar as it allows a few citizens to deny an individual the use of his property." Geo-Tech Reclamation Industries, Inc. v. Potesta, No. 2:87-0671, slip op. at 3 (S.D. W.Va. Dec. 22, 1988). In conclusion to a brief opinion, the judge wrote:
 
 
 10
 The Court, perceiving no rational basis for permitting a few to restrict the use of another's property, finds W.V.Code, 20-5F-4(b), to be an unconstitutional delegation of power ... summary judgment should be granted and W.V.Code, 20-5F-4(b), be declared violative of the United States Constitution insofar as it permits public sentiment to be the determining factor in not granting a permit for developing a solid waste facility.
 
 
 11
 Id., at 4-5.
 
 C.
 
 12
 Plaintiff Carl Crooks filed a separate suit for a declaratory judgment after the Director denied his application to operate a landfill in Wood County, West Virginia. Crooks' application, like those of GRI and LCS, was denied because of adverse public sentiment. Following its decision in Geo-Tech v. Potesta, supra, the district court granted Crooks' motion for summary judgment and ordered the Department to issue a landfill operating permit.
 
 II.
 
 13
 West Virginia now appeals from the district court's determination that the "significantly adverse to the public sentiment" clause of Sec. 20-5F-4(b) violates the Constitution. GRI, LCS, and Crooks argue here, as they did below, that under the Supreme Court's decisions in Eubank v. City of Richmond, 226 U.S. 137, 33 S.Ct. 76, 57 L.Ed. 156 (1912) and Washington Ex Rel. Seattle Title Trust Co. v. Roberge, 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210 (1928), Sec. 20-5F-4(b) violates due process by impermissibly delegating legislative authority to a narrow segment of West Virginia's citizenry. They argue that Sec. 20-5F-4(b) gives local residents de facto veto power over the landfill permit process. They support this contention by reference to testimony before the Water Resources Board during which the Director stated that he rejected the permits at issue here, even though the proposed landfills met all technical requirements, merely because local residents were opposed to the projects.
 
 
 14
 In Eubank the Court confronted a Richmond ordinance that required the city's Building Committee to establish set-back lines for a given piece of property whenever requested to do so by two-thirds of the adjacent property owners. The Court ruled that this ordinance violated due process, stating:
 
 
 15
 One set of owners determines not only the extent of use, but the kind of use which another set of owners may make of their property ... The statute and ordinance, while conferring the power on some property holders to virtually control and dispose of the property rights of others, creates no standard by which the power thus given is to be exercised ... The only discretion which exists in the street committee, or in the committee of public safety, is in the location of the line, between 5 and 30 feet.
 
 
 16
 Eubank, 226 U.S., at 143-44, 33 S.Ct., at 77. The Roberge Court threw out a Seattle ordinance, on similar grounds, that conditioned a building permit for a charitable home on obtaining the consent of two-thirds of the owners located within four hundred feet of the proposed building. In his opinion for a unanimous court, Justice Butler wrote:
 
 
 17
 The [ordinance] purports to give the owners of less than one-half the land within 400 feet of the proposed building authority--uncontrolled by any standard or rule prescribed by legislative action--to prevent the trustee from using its land for the proposed home. The superintendent is bound by the decision or inaction of such owners. There is no provision for review under the ordinance; their failure to give consent is final. [Local residents] are not bound by any official duty, but are free to withhold consent for selfish reasons or arbitrarily, and may subject the trustee to their will or caprice. The delegation of power so attempted is repugnant to the due process clause of the 14th Amendment.
 
 
 18
 Roberge, 278 U.S., at 121-122, 49 S.Ct., at 52 (citations omitted).
 
 
 19
 West Virginia's response to this argument is straight-forward. The state contends that the statute does not impermissibly delegate legislative authority to private citizens because Sec. 20-5F-4(b) does not give local residents any legal power to block the approval of an otherwise qualified permit application. The state points to the fact that the statute does not require the Director's decision to conform to local public sentiment but merely states that he "may" reject an application on the ground that it has engendered adverse local opinion. Thus Sec. 20-5F-4(b) merely gives the Director the authority to consult local public sentiment as one of many factors to be considered in the exercise of his discretion. This fact, according to West Virginia, distinguishes Sec. 20-5F-4(b) from the laws invalidated in Eubank and Roberge.
 
 
 20
 We see no reason, however, to decide whether Sec. 20-5F-4(b) works an impermissible delegation of power to local residents because the statute suffers from a more profound constitutional infirmity. It is well settled that land-use regulations "must find their justification in some aspect of the police power, asserted for the public welfare." Euclid v. Ambler Realty Co., 272 U.S. 365, 387, 47 S.Ct. 114, 118, 71 L.Ed. 303 (1926). West Virginia strenuously argues that it acts well within the broad confines of its police power in regulating the development of solid waste disposal facilities. With this we certainly agree. No one would question the state's power to impose a broad array of restrictions on an activity, such as the operation of a landfill, which was recognized as a nuisance even by the early common law.
 
 
 21
 West Virginia also argues that within this broad array of restrictions, the state may legislate to protect its communities against not only such tangible effects as increased traffic, noise, odors, and health concerns, but also against the possibility of decreased community pride and fracturing of community spirit that may accompany large waste disposal operations. Here again, we do not quarrel with the state's position. "The concept of the public welfare is broad and inclusive. The values it represents are spiritual as well as physical, aesthetic as well as monetary." Berman v. Parker, 348 U.S. 26, 33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954) (citations omitted). Accord Village of Belle Terre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). West Virginia may undoubtedly regulate the siting and operation of solid waste disposal facilities so as to eliminate or at least alleviate the deleterious effects of such facilities on more inchoate community values.
 
 
 22
 The question raised in this case, however, is whether Sec. 20-5F-4(b) does in fact further this laudable purpose or whether it is instead "arbitrary and capricious, having no substantial relation" to its purported goal. See Euclid, 272 U.S., at 395, 47 S.Ct., at 121. The state argues that the statute's adverse public sentiment clause promotes its stated purpose by allowing citizens to comment upon a proposed landfill's impact on community pride, spirit, and quality of life. But, with commendable candor, the state also recognizes that many who may speak out against a landfill will do so because of self-interest, bias, or ignorance. These are but a few of the less than noble motivations commonly referred to as the "Not-in-My-Backyard" syndrome.
 
 
 23
 West Virginia argues that Sec. 20-5F-4(b) nonetheless protects the administrative permit process from such base criteria for decision-making by vesting final authority in the Director who must exercise his or her discretion in determining whether adverse public sentiment is "significant." We are unable, however, to discern within the language of Sec. 20-5F-4(b) any meaningful standard by which the Director is to measure adverse sentiment.[2] Indeed, the facts of these consolidated cases plainly show that the Director made no effort to cull out the wheat from the chaff of public opposition to these permits.[3] And in the absence of any such effort, whether it be mandated by the statute or attempted as a matter of administrative policy, we can find no substantial or rational relationship between the statute's goals and its means. "Where property interests are adversely affected by zoning, the courts generally have emphasized the breadth of municipal power to control land use and have sustained the regulation if it is rationally related to legitimate state concerns ... But an ordinance may fail even under that limited standard of review." Schad v. Mt. Ephraim, 452 U.S. 61, 68, 101 S.Ct. 2176, 2182, 68 L.Ed.2d 671 (1981) (citations omitted). Nothing in the record suggests, nor can we conceive, how unreflective and unreasoned public sentiment that "a dump is still a dump" is in any way rationally related to the otherwise legitimate goal of protecting community spirit and pride.
 
 
 24
 While we need express no opinion as to whether Sec. 20-5F-4(b) works an impermissible delegation of legislative authority of the sort condemned in Eubank and Roberge, we find it instructive to note that the evil there denounced is equally present here. In both cases, the Court noted that administrative decision-making was made potentially subservient to selfish or arbitrary motivations or the whims of local taste. Eubank, 226 U.S., at 144, 33 S.Ct., at 77, Roberge, 278 U.S., at 122, 49 S.Ct., at 52. Cf. Silverman v. Barry, 851 F.2d 434 (DC Cir.1988) (Silberman J., concurring in the denial of rehearing en banc, suggesting that delegation of authority to private citizens was not the Supreme Court's real concern in Eubank and Roberge ). The same potential is present here. The Director has been commanded, without the benefit of any legislated standard by which to separate public sentiment grounded upon reasoned considerations substantially related to civic spirit from irrational public sentiment or whim, to act upon adverse public sentiment in issuing waste facility operating permits. The potential that, by virtue of Sec. 20-5F-4(b), sensitive administrative decisions regarding waste disposal will be made by mob rule is too great to ignore.
 
 III.
 
 25
 Accordingly, we find that Sec. 20-5F-4(b)'s clause authorizing the Director to reject permits that are "significantly adverse to the public sentiment" bears no substantial or rational relationship to the state's interest in promoting the general public welfare. The district court's decision is therefore
 
 
 26
 AFFIRMED.
 
 
 
 [1]
 West Virginia substantially revised its Solid Waste Management Act in 1988. See 1988 W.Va.Acts c. 84. While those revisions obviously took effect after the permits involved in this case were denied, the revisions did not alter the portion of Sec. 20-5F-4(b) at issue here
 
 
 [2]
 We do not suggest that federal law places any general restraints on the delegation of state power to state administrators or generally requires state power to be delegated according to well defined standards. See United Beverage Co. v. Indiana Alcoholic Beverage Commission, 760 F.2d 155 (7th Cir.1985) (listing a few limited areas where constitutional interests require state regulatory power to be exercised according to clearly articulated standards). We merely note that the absence of any standard by which the Director must evaluate adverse public sentiment, in part, deprives Sec. 20-5F-4(b) of any rational relation to the goal of protecting civic pride and general communal welfare
 
 
 [3]
 The Director, in his testimony before the West Virginia Water Resources Board, suggested that the statute's use of the term "significant" merely required adverse sentiment be expressed by a sufficient number of local residents and that opposition from just a handful of residents would not suffice. This total emphasis on the quantity rather than the quality or content of public comment helps to illustrate the lack of any rational relation between the statute and its purported goal