**Paul SCHULZ and Deborah Savage, Plaintiffs,**

v.

**Terry MILNE, City and County of San Francisco, Department of City Planning, Department of Public Works, Bernal Heights Neighborhood Review Board, Bernal Heights East Slope Design Review Board, Jeffrey Ma, Peter Alberts, Robert Passmore, Rafael Torres–Gill, Barbara Roxzanik–Kugay, Renegal Woo, Pedro Arce, Larry Litchfield, Mike Inan, and Does 1 Through 200, Defendants.**

No. C–93–0352–VRW.

United States District Court, N.D. California.

April 22, 1994.

Thomas N. Lippe, David M. Fox, Law
Offices of Thomas N. Lippe, San Francisco,

**710**

CA, for plaintiffs Paul Schulz and Deborah Savage.

Christopher P. Witteman, Law Offices of Christopher Witteman, San Francisco, CA, for defendant Milne.

Louise H. Renne, City Atty., Andrew W. Schwartz, Deputy City Atty., San Francisco, CA, for defendants City and County of San Francisco, Jeffrey Ma, Rafael Torres–Gill, and Robert Passmore.

## ORDER.

WALKER, District Judge.

In 1988, plaintiffs, Paul Schulz and Deborah Savage, purchased a house at 251 Ripley Street located in the Bernal Heights neighborhood of San Francisco. The house was dilapidated, unsafe and uninhabitable. Plaintiffs decided to renovate the house and filed an application with the City and County of San Francisco, Department of City Planning and Department of Public Works (together, "City") for the required permits. In the application, plaintiffs requested permission to add a floor to the existing house, alter the existing interior and basement and add twelve feet to the rear of the house. The City allegedly told plaintiffs that they had to work out any renovation plans with defendants Bernal Heights Neighborhood Review Board ("the Board") and Terry Milne, an officer on the Board. The Board is a local citizen's group that offers comments and recommendations to the City on building projects in the Bernal Heights neighborhood.

From 1988 to 1991, plaintiffs pursued an application to the City and the Board for a permit to repair and upgrade their property. According to plaintiffs, they submitted approximately thirteen revisions to the initial permit application, and incurred great expenses in the process. Plaintiffs contend that each time they presented a revision in compliance with all applicable zoning laws, the City, the Board, and Milne refused to approve the plan, and instead informed plaintiffs that there were additional requirements, not found in any zoning or other statutes, which plaintiffs had yet to meet. Plaintiffs allege that defendants "repeatedly, consistently, arbitrarily and capriciously" failed to approve their renovation plans. At one point, after the City finally approved their permit application, but before plaintiffs could begin work, plaintiffs claim that the City revoked the permit on the recommendations of Milne and the Board. Plaintiffs object to the fact that they had no notice or opportunity to be heard before the revocation. When the City finally issued a second permit in November 1991, plaintiffs maintain that they had expended so much money pursuing permits that they were financially ruined and incapable of renovating their home.

Plaintiffs filed a complaint for damages alleging various torts and constitutional violations. On October 28, 1993, the court granted defendants' motions to dismiss the first amended complaint. Most of plaintiffs' original claims were dismissed without prejudice. In dismissing the first amended complaint, the court noted that plaintiffs might be able to allege an action for injunctive relief and possibly damages under 42 U.S.C. § 1983 against defendants for an unconstitutional delegation of state police power to a private entity. See Order Granting Defendants' Motion to Dismiss at 6–7.[1]

Plaintiffs apparently took the court's comment to heart and on December 17, 1993, filed a second amended complaint alleging, inter alia, that City violated several of plaintiffs' constitutional rights by delegating its power to review and decide on plaintiffs' land use application to Board and Milne. The second amended complaint alleges the following causes of action:

---

1. This court's prior order stated, in pertinent part:

It appears to the court that the City may have improperly contracted away its legislative and governmental functions to the Board and Milne, both of whom are private parties. Although the Ninth Circuit in *Stephens v. City of Vista,* 994 F.2d 650, 655 (9th Cir.1993), clearly held that a municipality may not "surrender" its control of a municipal function to a private party, plaintiffs fail to raise an improper delegation of legislative authority claim in their complaint or elsewhere. * * * Because of the importance of this issue, the court hereby **GRANTS** plaintiffs leave to file an amended complaint to address the matter.

Order dated October 28, 1993, at 6–7.

(1) damage claims under 42 USC §§ 1983, 1985(2)–(3) against all defendants for violating and conspiring to violate plaintiffs' constitutional rights [2] by reason of defendants' arbitrary delay tactics including City's delegation of police power to Board and Milne;

(2) an inverse condemnation claim under state law against all defendants;

(3) claims for common law fraud and deceit against Milne and the Board;

(4) claims for negligent misrepresentation against Milne and the Board;

(5) claims for intentional interference with prospective economic advantage against Milne, the Board, and various individual City employees; and

(6) claims for negligent interference with prospective economic advantage against Milne and the Board.

See Second Am Compl.

Defendants move to dismiss all of plaintiffs' claims. After considering the arguments, the court hereby **DENIES** defendants' motions to dismiss plaintiffs' § 1983 claims based on City's alleged unconstitutional delegation of legislative and police powers.

## I

■ Defendants make various arguments in support of their motions to dismiss plaintiffs' constitutional claims. The most fundamental challenge to plaintiffs' constitutional claims is the argument that plaintiffs are not even entitled to bring a claim of unconstitutional delegation of police or legislative power. See City's Reply Mem at 15. By making this argument, defendants apparently fail to apprehend basic constitutional tenets restricting the extent to which state power may be delegated to private parties. See *General Electric Co v. New York State Dept. of Labor,* 936 F.2d 1448, 1454 (2d Cir.1991) (citing numerous Supreme Court cases).

In *Eubank v. City of Richmond,* 226 U.S. 137, 33 S.Ct. 76, 57 L.Ed. 156 (1912), the Supreme Court scrutinized a municipal ordinance that required the City of Richmond's Building Committee to establish "set-back lines" for a specific parcel of property whenever requested to do so by two-thirds of adjacent land owners. In striking down the ordinance as a violation of due process, the Court stated:

> One set of owners determines not only the extent of use, but the kind of use which another set of owners may make of their property * * *. The statute and ordinance, while conferring the power on some property holders to virtually control and dispose of the property rights of others, creates no standard by which the power thus given is to be exercised; in other words, the property holders who desire and have the authority to establish the line may do so solely for their own interest and even capriciously.

Id. at 143–44, 33 S.Ct. at 77.

Similarly, in *Washington ex rel Seattle Title Trust Co v. Roberge,* 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210 (1928), the Supreme Court struck down a Seattle zoning ordinance requiring plaintiffs who sought to build a home for the aged poor to get the written consent of two-thirds of the property owners within four hundred feet of the proposed building. The Court stated:

> The [ordinance] purports to give the owners of less than one-half the land within 400 feet of the proposed building authority—uncontrolled by any standard or rule prescribed by legislative action—to prevent the trustee from using its land for the proposed home. The superintendent is bound by the decision or inaction of such owners. There is no provision for review under the ordinance; their failure to give consent is final. They are not bound by any official duty, but are free to withhold consent for selfish reasons or arbitrarily and may subject the trustee to their will or caprice. [citation omitted]. The delegation of power so attempted is repugnant to the due process clause of the Fourteenth Amendment.

Id. at 121–22, 49 S.Ct. at 52.

■ "*Eubank* and *Roberge* remain good law today." *General Electric,* 936 F.2d at

---

**2.** Plaintiffs allege violations of the Fifth Amendment (Takings Clause), substantive and procedural due process under the Fourteenth Amendment, and equal protection. See Second Am Compl at ¶¶ 65–82.

1455. See also *Geo–Tech Reclamation Industries, Inc. v. Hamrick,* 886 F.2d 662, 664–65 (4th Cir.1989); *Midnight Sessions, Ltd. v. City of Philadelphia,* 945 F.2d 667, 684–85 (3d Cir.1991). These cases stand for the proposition that the state may not constitutionally abdicate or surrender its power to regulate land-use to private individuals without supplying standards to govern the use of private discretion. See *General Electric,* 936 F.2d at 1455. "Otherwise, 'administrative decision-making [will be] made potentially subservient to selfish or arbitrary motivations or the whims of local taste.'" Id. (citing *Geo–Tech,* 886 F.2d at 666). Thus, these cases would prohibit a municipality from making a statutory or de-facto delegation of power to private decision-makers if the municipality does not provide safeguards or standards to govern the use of private discretion. Cf. *Assiniboine and Sioux Tribes v. Bd. of Oil and Gas,* 792 F.2d 782, 793–97 (9th Cir.1986) (reversing district court's dismissal of unlawful delegation claim against the federal Department of the Interior for allegedly "rubber-stamping" state agency's approval of applications to drill for oil on lands governed solely by federal jurisdiction).

In this case, plaintiffs have alleged facts sufficient to make out a claim of unconstitutional delegation of power against City.[3] Plaintiffs' primary claim is that City unlawfully surrendered regulatory power to Board and Milne for a period of time. The complaint alleges the following facts to support that claim:

(1) When plaintiffs first sought to remodel their house, they went to City and asked what plaintiffs had to do to get the necessary permits. City allegedly "told plaintiffs that, before submitting an application for a permit to remodel the house, plaintiffs had to submit their plans to MILNE and * * * BOARD pursuant to City Planning Commission Resolution No. 10854 * * *. *CITY also told plaintiffs that they would have to obtain approval of, or acquiescence to, their remodel plans from MILNE and * * * BOARD.*" Second Am Compl at ¶ 13 (emphasis added).

(2) After making various revisions and resubmitting their plans to City, plaintiffs were notified on or about September 21, 1989, by City that their permit had been approved and would be issued upon payment of certain fees. Id at ¶ 26. When plaintiffs attempted to pick up the permit in early October 1989, City told plaintiffs that "someone" had objected to the permit and the permit had been withdrawn. Plaintiffs allege that Board had contacted City and had the permit withdrawn. Id at ¶ 27.

(3) Over the next two years plaintiffs repeatedly requested City to make a decision on their permit. Plaintiffs allege that City consistently told plaintiffs that they would have to satisfy the * * * BOARD before CITY * * * would act on their application. Id at ¶ 30. Moreover, plaintiffs allege that City represented a number of times that if plaintiffs could meet the Board's objections, City would approve the application. See id at ¶¶ 31, 34, 37, 40, 42, 44. Each time plaintiffs revised their remodeling plans to accommodate the Board, the City allegedly reneged on its promise to issue the permit because Board raised new objections to plaintiffs' project. Id at ¶¶ 36, 38, 40, 44.

(4) As a result of this long and onerous permitting process, plaintiffs spent all of their money and resources to pay the costs of revising their proposal multiple times. See id at ¶ 16. By the time the permit was actually approved in November 1991 plaintiffs no longer had the money to pay for the actual remodelling. Because plaintiffs were unable to remodel their residence, plaintiffs have been forced to live in their business premises since 1987. Id at ¶ 55. Plaintiffs live there to this day because they allegedly still lack sufficient funds to go forward with the approved proposal to remodel their residence in Bernal Heights. Id.

These facts, when seen in the light most favorable to plaintiffs, give rise to a cognizable claim under *Eubank* and *Roberge* of unconstitutional de-facto delegation of regulatory power from City to Board and Milne. At a minimum, these facts create an inference

---

3. The court also concludes that plaintiff has alleged facts sufficient to state claims against Board and Milne under § 1983 as state actors.

that City simply "rubber stamped" the decisions of the Board and City did not actually use its public discretion to check the Board's use of its private discretion. After all, City allegedly told plaintiffs that they would *have* to get the approval of the Board before it would grant plaintiffs a permit. See Second Am Compl ¶ 13. Plaintiffs have been damaged by this alleged unconstitutional delegation. Plaintiffs have sufficiently stated § 1983 claims against defendants based on an unconstitutional delegation of state power.

■ City's argument that plaintiffs' constitutional claims are unripe is unpersuasive. Plaintiffs' claim of unconstitutional delegation does not challenge the denial of the permit or the substantive conditions placed on the permit. The violation complained of is City's de-facto delegation of decision-making authority to Board to determine whether plaintiff's proposal should be approved. Thus, City's alleged constitutional violation occurred the instant City delegated its authority to the Board and continued during the time this delegation persisted. There does not appear to be any avenue of appeal within the City's permit process to challenge such a violation. Thus, City's ripeness argument fails.

■ City also argues that in order to determine whether City delegated its regulatory authority to Board, the court would impermissibly serve as a "Super Zoning Board." City apparently assumes that the determination of whether an unlawful delegation has taken place requires the court to analyze each imposition of substantive conditions on plaintiffs' proposal and determine, using its independent judgment whether the conditions best serve the public interest. See City's Mem in Supp at 13–15; City's Reply Mem at 16–18. The true focus of the unlawful delegation analysis, however, is not on the substance of the conditions imposed, but rather the process that was used to reach the decision to impose the conditions. If City was simply a "rubber stamp" for the Board, it does not matter that Board's recommendations were rationally based or well served the public interest. City would still be liable for a de-facto abdication of its regulatory power to Board and Milne.

Defendants have not produced any argument that would warrant dismissal of plaintiffs' unlawful delegation constitutional claims. Accordingly, defendants' motions to dismiss plaintiffs' constitutional claims based on unlawful delegation of state power are hereby **DENIED.**

## II

■ Defendants also challenge the legal sufficiency of plaintiffs' inverse condemnation/takings claims solely on the ground of ripeness. The court addressed these issues in its prior order and dismissed plaintiffs' takings claim without prejudice for an apparent lack of ripeness. See Order dated October 28, 1993, at 3–6. In that order, the court gave plaintiffs leave to refile its takings claim if plaintiffs could show that other avenues of redress were insufficient. Id (" * * * it seems apparent that plaintiffs can return to federal court to litigate the federal [takings claim] once having pursued state court remedies unless they can first allege circumstances making that avenue of redress constitutionally defective"). Plaintiffs now attempt to show why they are entitled to bring their takings claim in federal court despite their failure to appeal to the City's Board of Appeals.

Plaintiffs claim that City effected a taking of plaintiffs' property by its "extraordinary delay" in processing plaintiffs' application for a license to remodel their home. See Pls' Mem in Opp to City's Mot at 4–5. During the three-years it took for plaintiffs to obtain a permit from City, plaintiffs allegedly used up all of their financial resources, including the money that was earmarked to pay the costs of actually remodelling plaintiffs' house.

Plaintiffs argue that their takings claims are ripe for adjudication because plaintiffs have no practical avenue of relief within the permitting process. This argument is compelling. There is nothing in the record to indicate that plaintiffs actually had a right to appeal their takings claim based on excessive delay to the City's Board of Appeals. According to the City, the Board of Appeals has authority to "approve or disapprove an alteration permit application, to modify any condition imposed on the permit, or to impose its

own conditions." City's Reply Mem at 6. It is not clear, moreover, that the Board of Appeals can provide plaintiffs a remedy for City's alleged excessive delay. A precondition to a proceeding before the Board of Appeals is a final decision on the permit. The gravamen of plaintiffs' claim of excessive delay is that the City persisted in its refusal to make such a decision, effectively foreclosing plaintiffs from availing themselves of whatever remedy the Board of Appeals might offer.

Under these circumstances, City's attempt to bar plaintiff's takings claims for lack of ripeness here is troubling, to say the last. City claims that plaintiffs are barred from seeking relief in this court until they first pursue their claim through all state court and City channels.[4] Yet, the reason plaintiffs are barred as a practical matter from seeking relief from the state courts or the City is because the City siphoned away all of plaintiffs' money by excessively delaying plaintiffs' application process. Plaintiffs can no longer afford to pursue state remedies. Because the heart of plaintiffs' takings claims is that plaintiffs were financially paralyzed from going forward with their remodelling plans or pursuing required state remedies by virtue of defendants' delay tactics, those state remedies are "constitutionally deficient" with respect to plaintiffs. Thus, in the absence of a state remedy for delay alone, plaintiffs' takings claims against defendants for excessive delay are ripe. See Order dated October 28, 1993, at 6. California Government Code section 65950 affords no such remedy as it allows the permitting agency, in this case, City, to delay action until the application is "complete." In this case, City refused to deem plaintiffs' application complete until shortly before issuing the second permit in November 1991, thus frustrating any relief that Section 65950 might otherwise afford. Accordingly, defendants' motions to dismiss plaintiffs' takings/inverse condemnation claims are hereby **DENIED**.

**III**

 Defendants also move to dismiss plaintiffs' interference with prospective economic advantage tort claims. Under California law, plaintiffs are required to allege, and ultimately to prove, the following elements:

(1) [A]n economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.

*Pacific Gas & Electric Co. v. Bear Stearns & Co.,* 50 Cal.3d 1118, 1126 n. 2, 270 Cal.Rptr. 1, 791 P.2d 587 (1990).

Board and Milne argue that plaintiffs have failed to allege a protectible "economic relationship" between plaintiffs and a third party. Plaintiffs attempt to satisfy the first element by alleging an "economic relationship" between themselves and the City by virtue of plaintiffs' attempts to get a permit from City to remodel their house. The court is not convinced that a municipal licensing process can give rise to an "economic relationship" between the licensee and the municipality, protectible under the tort doctrine of interference with prospective economic advantage. Under plaintiffs' theory, every time an application for a building permit is filed, a protectible relationship would be formed. Citizens who object to the grant of the permit and municipal employees who oppose the grant of the permit would then be tortiously interfering with this alleged beneficial economic relationship.

Plaintiffs' theory has been considered and rejected by the California courts. In *Blank v. Kirwan,* 39 Cal.3d 311, 216 Cal.Rptr. 718, 730, 703 P.2d 58 (1985), the California Supreme Court rejected the argument that a plaintiff could base a claim of interference with prospective economic advantage solely on a licensing relationship with a municipali-

---

**4.** In *Williamson County Regional Planning Comm. v. Hamilton Bank,* 473 U.S. 172, 194–95, 105 S.Ct. 3108, 3120–21, 87 L.Ed.2d 126 (1985) the Supreme Court required plaintiffs to "seek

compensation through the procedures the State has provided for doing so" before turning to the "federal courts."

ty. In that case, plaintiff applied for a license to operate a poker club. The City of Bell denied the application and plaintiff brought suit against the City and private individuals, alleging a conspiracy to violate the Cartwright Act (for unfair competition) and for interference with prospective economic advantage. The court upheld the lower court's dismissal of the interference with prospective economic advantage claim on the ground that plaintiff had no protectible economic relationship with the City. The court based its ruling on two separate and independent reasons. "First, '[t]he relationship between [plaintiff] and the City cannot be characterized as an economic relationship.'" Id. (quoting *Asia Investment Co. v. Borowski*, 133 Cal.App.3d 832, 184 Cal.Rptr. 317 (1982)). "Second, even if the relationship between plaintiff and the city could be so characterized [as an economic relationship]," plaintiff did not have a protectible "expectancy" in the governmental licensing process because "the city council's discretion to grant or deny an application for a poker club license is so broad as to negate the existence of the requisite 'expectancy' as a matter of law." Id.

■ In this case, plaintiffs attempt to distinguish *Blank* by pointing to City's alleged lack of discretion in denying plaintiffs' application to remodel their house. City's discretion is allegedly constrained by the City Planning Code which supposedly mandates the grant of a license to an applicant that complies with the Code. See Pls' Mem in Opp to City's Motion at 21. In making this argument, plaintiffs have obviously focussed solely on the second, alternative ground for dismissal stated in *Blank*. Plaintiffs ignore, however, the fact that the *Blank* court also upheld the dismissal of the interference with prospective economic advantage claim based on the separate and independent ground that the licensing process between the plaintiff in that case and the City of Bell did not constitute a protectible economic relationship *under any circumstances*. Id. The first ground of dismissal articulated in *Blank* justifies dismissal in this case as well. City's level of discretion in the licensing process is simply irrelevant when the licensing process itself, cannot give rise to a protectible economic relationship.

Plaintiffs' cite to *SCEcorp v. Superior Court*, 3 Cal.App.4th 673, 4 Cal.Rptr.2d 372 (1992) for the proposition that lack of discretion in the licensing process can create a protectible relationship is unavailing. In that case, the plaintiff, an electric utility, brought an action against a corporation for tortious interference with plaintiff's written merger agreement with another utility. A condition precedent to the merger agreement was that the agreement receive regulatory approval from the California Public Utilities Commission, and others. Id. 4 Cal.Rptr.2d at 373. The California Court of Appeal held that the requirement of regulatory approval did not defeat the tortious interference claims. Id. at 375–78. The court first noted that the "contractual relationship of parties to a merger agreement is clearly within the mainstream of protection under tortious interference principles." Id. at 375. According to the *SCEcorp* court, these principles do not change when a merger agreement between two contracting parties is conditioned on regulatory approval. Id. "The prevailing reason for allowing such tortious interference claims is the general principle that the rights of contracting parties should be protected from wrongful interference by third parties." Id.

In arriving at its conclusion, the *SCEcorp* court distinguished *Blank* on three grounds: First, [*Blank*] primarily involved Cartwright Act claims. Second, the plaintiff had no valid contract which was interfered with by the defendant. Third, the discretion of a city council in issuing a poker club license application is probably greater, and is of a different nature, than the regulatory approvals involved with respect to the Merger Contract in this case. Finally, a poker club license application is not an "ordinary commercial dealing" unlike a merger agreement of two companies.

Id. at 376. Based solely on the third ground, plaintiffs in this case argue that the *SCEcorp* court held that City's lack of discretion in approving plaintiffs' license application could give rise to a protectible economic relationship.

Again, plaintiffs unjustifiably attempt to expand the scope of the case law. The language of the *SCEcorp* opinion quoted above clearly indicates that the court in that case found the existence of an actual contractual relationship to be the controlling factor in determining whether a tortious interference claim could be stated. Id. at 375. Thus, the court distinguished its case from *Blank* by noting that the plaintiff in *Blank* "had no valid *contract* which was interfered with by defendant," that the license application in *Blank* was "of a *different nature* * * * than the regulatory approvals involved with respect to the Merger *Contract* in [its] case," and that unlike the merger contract, the *Blank* license application was not an "ordinary commercial dealing." Id. at 376 (emphasis added). These statements indicate that municipal discretion was only an ancillary issue which the *SCEcorp* court mentioned to bolster further its primary rationale that a contractual relationship is protectible regardless of the fact that it was subject to a condition requiring municipal approval.

The court reads *Blank* and *SCEcorp* together to mean that the existence of municipal licensing is irrelevant to determine whether a protectible economic relationship exists. *Blank* states that the licensing process, alone, cannot give rise to a protectible economic relationship. See *Blank*, 216 Cal. Rptr. at 730. *SCEcorp* states that municipal approval does not defeat the existence of an otherwise protectible contractual relationship between two other parties. See *SCEcorp*, 4 Cal.Rptr.2d at 375. In the instant case, plaintiffs do not allege a contractual relationship with the City or any other entity. The only thing plaintiffs have is the standard licensee to licensor relationship with the City created by the land-use permitting process. Under the rationale stated in *Blank*, plaintiffs do not have an economic relationship that would give rise to valid tortious interference claims.

Accordingly, the court hereby **DISMISSES** all of plaintiffs' claims for intentional and negligent tortious interference with prospective economic advantage. Because plaintiffs have had two opportunities to satisfy pleading requirements for these claims, this dismissal shall be **WITH PREJUDICE.**

## IV

■ Defendants Board and Milne move to dismiss plaintiffs' fraud claims against them. The complaint, liberally construed, does not fail to state fraud claims against Board and Milne.

It does not appear from the face of the complaint that any privileges would protect Milne or Board from liability for these claims. Nor would the First Amendment protect Milne and Board from plaintiffs' claims of intentional misrepresentation. See *Time, Inc. v. Hill*, 385 U.S. 374, 389, 87 S.Ct. 534, 542, 17 L.Ed.2d 456 (1967) ("[T]he constitutional guarantees can tolerate sanctions against calculated falsehood without significant impairment of their essential function"); *Time, Inc. v. Firestone*, 424 U.S. 448, 472, 96 S.Ct. 958, 973, 47 L.Ed.2d 154 (1976) (Brennan dissenting) (" 'calculated falsehood' is no part of the expression protected by the central meaning of the First Amendment * * *.")

Moreover, plaintiffs have adequately alleged facts to support a legal duty in Milne and the Board not *intentionally* to defraud plaintiffs. As the court in *Lacher v. Superior Court*, 230 Cal.App.3d 1038, 281 Cal.Rptr. 640, 643–44 (1991), stated:

> Intentional fraud is actionable because of the knowing intent to induce someone's action to his or her detriment with false representations of fact. "Fraud is an intentional tort, and the element of fraudulent intent, or intent to deceive, distinguishes it from actionable negligent misrepresentation * * *" *It is the element of intent which makes the fraud actionable, irrespective of any contractual or fiduciary duty one party might owe the other* (emphasis added).

In other words, "everyone has a duty to refrain from committing intentionally tortious conduct against another." Id. 281 Cal. Rptr. at 644 (quoting *Cicone v. URS Corp.*, 183 Cal.App.3d 194, 227 Cal.Rptr. 887 (1986)). Thus, plaintiffs' fraud claims are supported by a sufficient legal duty.

Accordingly, Board's and Milne's motions to dismiss the fraud claims against them are hereby **DENIED.**

### V

■ Board and Milne also move to dismiss plaintiffs' claims of negligent misrepresentation on the grounds that plaintiffs failed to identify a duty that Board and Milne owed to plaintiffs, and Board's and Milne's actions were protected by the First Amendment and various state law privileges.

These arguments were made, however, under the assumption that Board and Milne were only private entities and individuals acting in "advisory and voluntary role[s] in the City process." See Board's Mem in Supp at 8. It is not clear that any of Board's and Milne's arguments would warrant a dismissal of plaintiffs' negligent misrepresentation claims if Board and Milne are deemed to be state actors, by virtue of having accepted a de facto delegation of power from the City.[5] Because Board's and Milne's arguments to dismiss the negligent misrepresentation claims do not address the possibility that Board and Milne were de facto state actors with regard to plaintiffs' application for a permit, Board's and Milne's motions to dismiss the negligent misrepresentation claims are hereby **DENIED WITHOUT PREJUDICE.**

IT IS SO ORDERED.

---

5. For instance, Milne and Board would be hard-pressed to argue that they had no duty to plaintiffs or were protected by the First Amendment if Milne and Board knew that they were the de facto ultimate decision-makers on plaintiffs land use proposal.