454 S.E.2d 405

**STATE of West Virginia ex rel. J. Edward HAMRICK, III, Director, Division of Natural Resources, et al., Plaintiffs Below, Appellees**

v.

**LCS SERVICES, INC., a West Virginia Corporation; Chambers of West Virginia, Inc., a West Virginia Corporation; and Chambers Development Company, Inc., a Delaware Corporation, Defendants Below, Appellants.**

No. 21958.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 4, 1994.

Decided Dec. 16, 1994.

---

P. Rodney Jackson and Lonnie C. Simmons, DiTrapano & Jackson, Charleston, for appellants.

William E. Adams, Jr., Gen. Counsel, Div. of Environmental Protection, Nitro, for Div. of Environmental Protection.

Larry Harless, Charleston, for Intervenor Citizens, C.U.R.E.

Clarence E. Martin, III and George V. Piper, Martinsburg, for Berkeley County Solid Waste Authority.

Janet L. Scalia, Asst. Pros. Atty. for Berkeley County, Martinsburg, for Berkeley County Com'n.

Daniel C. Staggers, Martinsburg, for City of Martinsburg, amicus curiae.

PER CURIAM:

The appellants, LCS Services, Chambers of West Virginia, Inc., and Chambers Development Co., Inc., (hereinafter collectively "LCS") appeal the order of the Circuit Court of Berkeley County which enjoined the ap-

pellants from accepting waste at their landfill in Hedgesville until the landfill received site approval from the Berkeley County Solid Waste Authority (hereinafter "the Solid Waste Authority") pursuant to *W.Va.Code,* 20–9–12b [1989]. The appellees are the Solid Waste Authority, the Division of Environmental Protection,[1] the Berkeley County Commission (hereinafter the "County Commission"), and C.U.R.E. (formerly The Eastern Panhandle Citizens Against Out–of–State Waste, Inc.). The circuit court further held that the landfill could not accept more than 9,999 tons of waste per month, making it a Class B landfill. For reasons explained below, the order of the circuit court is affirmed, in part, and reversed, in part.

I

Although the case before us is procedurally convoluted, the issue is quite simple: must LCS obtain specific site approval from the Solid Waste Authority in order to continue the operation of its landfill. In order to resolve this issue, however, it is necessary to analyze how the pertinent statutes in the Solid Waste Management Act, which was originally enacted in 1983 and was found in *W.Va.Code,* 20–5F–1 to 20–5F–12,[2] and the County and Regional Solid Waste Authorities article, which was originally enacted in 1988 and was set forth in *W.Va.Code,* 20–9–1 to 20–9–13,[3] control the events which occurred in this case.

In 1987 LCS filed an application with the West Virginia Division of Natural Resources (hereinafter "DNR") for a permit for a solid waste facility. The DNR denied the application for the following three reasons pursuant to *W.Va.Code,* 20–5F–4(b) [1983]: (1) de-

---

1. LCS points out that the jurisdiction for the control of solid waste in West Virginia was transferred from the Division of Natural Resources to the Division of Environmental Protection when the legislature amended *W.Va.Code,* 20–5F–1 through 12 in 1993.

2. The editors of the *West Virginia Code* note in the 1994 Cumulative Supplement: "Former article 5F, §§ 20–5F–1 to 20–5F–12 (enacted by Acts 1983, c. 171 and amended by Acts 1988, c. 84; 1989, c. 148; 1990, cc. 125, 126 and 169; and 1991, 2nd Ex.Sess., c. 22), concerning solid waste management, was repealed by Acts 1994,

c. 61. Former § 20–5F–12 was previously repealed by Acts 1993, c. 126. For disposition of §§ 20–5F–2 and 20–5F–8, as amended by Acts 1994, 1st Ex.Sess., c. 31, see §§ 22–15–2 and 22–15–17, respectively."

3. The editors of the *West Virginia Code* note in the 1994 Cumulative Supplement: "Former article 9, §§ 20–9–1 to 20–9–13 (enacted by Acts 1988, c. 84 and amended by Acts 1989, c. 184; 1990, c. 169; 1991, 2nd Ex.Sess., c. 22; 1992, c. 182; and 1993, c. 124), concerning solid waste authorities, was repealed by Acts 1994, c. 61."

struction of aesthetic values; (2) destruction and endangerment of property; and (3) adverse public sentiment.

LCS filed an action in the United States District Court for the Southern District of West Virginia (hereinafter the "U.S. District Court") challenging the constitutionality of the adverse public sentiment provision in *W.Va.Code,* 20–5F–4(b) [1983]. In the meantime, the Water Resources Board held that the DNR improperly denied LCS's application on the first two grounds: the destruction of aesthetic values and the destruction and endangerment of property. However, the Water Resources Board affirmed the DNR's denial of LCS's permit only on the ground of adverse public sentiment.

On March 12, 1988, subsequent to the decision of the Water Resources Board, but before the U.S. District Court ruled on the constitutionality of the adverse public sentiment provision, the legislature enacted *W.Va. Code,* 20–5F–4a [1988] which requires "Class A" applicants for solid waste permits to obtain site approval from county or regional solid waste authorities as a prerequisite to further processing of the permit application.[4]

On December 22, 1988, the U.S. District Court declared that the adverse public sentiment provision in *W.Va.Code,* 20–5F–4(b) [1983, 1988] was unconstitutional because it violates due process principles.[5] On January 18, 1989, the U.S. District Court issued a temporary restraining order to the Water Resources Board *to reconsider* the DNR's denial of LCS's permit application in accordance with the December 22, 1988 decision and the applicable laws in effect *on February 3, 1988,* which was the date that the Water Resources Board upheld the DNR's denial based upon the adverse public sentiment provision. Specifically, we note that the statutes requiring site approval by the county or regional Solid Waste Authority were not in effect on February 3, 1988.

On January 25, 1989, the Water Resources Board issued an order granting LCS a permit to construct and operate its solid waste facility, effective January 23, 1989; however, the Water Resources Board stated that the public could make additional comments and the DNR could make any necessary changes before it would enter a final order.

Prior to the final order being entered by the Water Resources Board, the legislature enacted *W.Va.Code,* 20–9–12b, which was effective on April 8, 1989. *W.Va.Code,* 20–9–12b [1989] mandated that it shall be unlawful for any person to establish, construct, or install a commercial solid waste landfill without a certificate of site approval from the county or regional Solid Waste Authority.

On September 27, 1989, the Water Resources Board entered its final order granting LCS's permit. The permit authorized LCS to accept up to 9,999 tons of waste over existing roads, but allowed unlimited tonnage by other means such as private rail line or private roads. The decision of the Water Resources Board did not require LCS to obtain site approval from the county or regional Solid Waste Authority. This decision was not appealed.

Thereafter, the DNR contended that county or regional authorities could prevent the construction and operation of LCS's facility by denying site approval pursuant to *W.Va. Code,* 20–9–12b [1989]. Consequently, LCS filed a motion in the U.S. District Court to declare those statutes inapplicable.

The U.S. District Court entered an order, dated October 26, 1989, requiring the DNR to apply the laws governing permit applications which were in effect on February 3, 1988, to LCS. On May 31, 1990, the U.S. District Court granted injunctive relief in order to effectuate the October 26, 1989 order. Thereafter, LCS began constructing the solid waste facility, and the U.S. District

---

4. A Class A facility is a facility which handles 10,000 tons or more of solid waste per month. *W.Va.Code,* 20–5F–2(m) [1990]. A Class B facility handles less than 10,000 tons of solid waste per month. The distinction is important because some of the statutes governing site approval by the solid waste authority apply solely to Class A facilities.

5. The U.S. District Court's decision was affirmed by the Fourth Circuit Court of Appeals on September 25, 1989. *See Geo–Tech Reclamation Industries, Inc. v. Hamrick,* 886 F.2d 662 (4th Cir. 1989).

Court's order, dated May 31, 1990, was appealed to the United States Court of Appeals for the Fourth Circuit.

In the meantime, the DNR instituted an action against LCS in the Circuit Court of Berkeley County seeking a declaration that LCS was operating a landfill without a certificate of site approval from the solid waste authority. Eventually, the DNR filed a second action against LCS seeking a preliminary injunction and a declaration that the handling of 10,000 tons or more of solid waste per month by LCS would violate *W.Va. Code*, 20–9–12c [1990], which imposes tonnage limitations upon solid waste.[6]

The Circuit Court of Berkeley County denied the relief sought by the DNR stating that under the doctrines of *res judicata* and collateral estoppel the U.S. District Court's determination that the permit application procedures in effect on February 3, 1988, precluded LCS from having to obtain site approval from the Solid Waste Authority.

Thereafter, the United States Court of Appeals for the Fourth Circuit reversed the U.S. District Court's May 31, 1990 order which enjoined the DNR from prosecuting the state court actions against LCS. *LCS Services, Inc. v. Hamrick*, 925 F.2d 745 (4th Cir.1991). The focus of the United States Court of Appeals for the Fourth Circuit's decision was on whether the lower court's order violated 28 U.S.C. § 2283 (1988), the "Anti–Injunction Act" which provides: "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

LCS argued that the injunction ordered by the lower court was proper under the Anti–Injunction Act in order to protect or effectuate judgments. The United States Court of

Appeals for the Fourth Circuit rejected this contention by holding:

[W]e find that this exception does not apply, because no claim or issue pending in the state court actions has ever been decided by the United States District Court. The district court has only made two prior judgments: (1) that the statutory provision for granting permits was unconstitutional, and (2) that the state had to apply the permit application procedures in effect on February 3, 1988 to LCS. Neither of these judgments affects the state actions and the state actions do not seek to relitigate the two issues decided by the prior actions in the district court.

*LCS Services, Inc.*, 925 F.2d at 749.

The DNR appealed the Circuit Court of Berkeley County's decision to this Court. This Court, following the reasoning of the United States Court of Appeals for the Fourth Circuit, held that the doctrines of *res judicata* and collateral estoppel did not apply because the permit procedure which was in effect on February 3, 1988 is separate from the requirement of site approval by the Solid Waste Authority. *State ex rel. Hamrick v. LCS Services*, 186 W.Va. 702, 414 S.E.2d 620 (1992). Additionally, this Court pointed out that no court had determined whether the statutes governing site approval by the Solid Waste Authority were applicable to LCS. This Court remanded the case to the Circuit Court of Berkeley County.

Thereafter, the Circuit Court of Berkeley County limited LCS to 9,999 tons of waste per month. The circuit court also ruled that LCS was required to obtain a certificate of site approval from the Solid Waste Authority. It is from this order that LCS now appeals.

## II

As we stated previously, although the facts are difficult to follow, the sole issue before us

---

6. *W.Va.Code*, 20–9–12c(b) [1990] states, in pertinent part:

Notwithstanding any other provisions of this chapter to the contrary, a person who, on the effective date of this section holds a valid Class A approval permit or compliance order issued by the division of natural resources, pursuant to article five-f of this chapter, may continue to operate if, by the first day of June, one thousand nine hundred ninety, the county commission of the county in which such facility is located approves the continued handling of ten thousand tons or more of solid waste per month: Provided, That the decision of the county commission is subject to review by referendum of the citizens of the county in which such facility is located.

is simply this: must LCS obtain specific site approval from the Solid Waste Authority before it may operate its solid waste facility. We stress, however, that the difficulty of analyzing an issue such as this arises from the rapid number of statutory changes which have occurred since LCS originally applied for a permit to operate a solid waste facility. In order to fairly resolve this issue, it is important not to become distracted with the many statutory changes. Instead, we will focus our attention on what was statutorily required of everyone involved when the issue of whether a permit would be granted to LCS was before the Water Resources Board on January 25, 1989.

Before discussing this issue, we note that when this case was previously before us, we declined to address the issue of whether site approval by the Solid Waste Authority applied to LCS since it had not been addressed by a court below. *See State ex rel. Hamrick*, 186 W.Va. at 708 n. 9, 414 S.E.2d at 626 n. 9 (1992). However, now the issue is clearly before us.

■ This issue involves the interpretation of statutes. Because interpreting a statute is a legal issue, our review of the statutes in the case before us is plenary. *See Donley v. Bracken*, 192 W.Va. 383, 387, 452 S.E.2d 699, 703 (1994). With this in mind, we will now address the issue.

On January 25, 1989, *W.Va.Code*, 20–5F–4a [1988] required a Class A applicant to obtain a county approval permit from either a county commission or a solid waste authority prior to filing the permit application with the DNR. However, in the case before us, *W.Va.Code*, 20–5F–4a [1988] is inapplicable because LCS is operating a Class B solid waste facility and not a Class A solid waste facility.[7]

Other than *W.Va.Code*, 20–5F–4a [1988], there were no other statutory provisions regarding local site approval on January 25, 1989. Therefore, the Water Resources Board entered its order on that date granting LCS a permit to construct and operate a solid waste facility subject to the following four conditions: (1) the construction and operation of the solid waste facility is to be in accordance with the permit application; (2) the DNR is to examine the permit application to determine whether or not any engineering changes to the solid waste facility are needed; (3) the public is to be given the opportunity to comment on the permit; and (4) a final order will be entered following the comment period.[8] Additionally, in the Janu-

7. As the Division of Environmental Protection notes, LCS does not contest the circuit court's finding that LCS is prohibited from accepting more than 9,999 tons of solid waste per month. In fact, LCS states in its brief that it will not address the circuit court's finding that LCS is prohibited from accepting more than 9,999 tons of solid waste per month. We have stated that assignments of error not argued in an appellant's brief may be deemed waived. Syllabus point 3, *Higginbotham v. City of Charleston*, 157 W.Va. 724, 204 S.E.2d 1 (1974), *overruled on other grounds by*, *O'Neil v. City of Parkersburg*, 160 W.Va. 694, 237 S.E.2d 504 (1977). Therefore, for purposes of analyzing the case now before us, we will consider LCS as seeking to operate a Class B solid waste facility.

8. The January 25, 1989 order of the Water Resources Board states, in relevant part, that LCS would be granted

a permit to construct and operate a solid waste facility ... subject to the following conditions:
(1) Construction and operation of the solid waste facility shall be in accordance with the LCS permit application, which is a part of the record in this appeal, and any subsequent modifications to the permit application ap-

proved by the [Water Resources Board] or the DNR.
(2) The LCS permit application shall be reviewed by a representative of DNR and a representative of LCS to determine whether any engineering changes to the solid waste facility are necessary or desirable. The representatives of DNR and LCS shall report on their findings to each other on or before February 10, 1989, and shall report back to the [Water Resources Board] with their findings on February 10, 1989. The [Water Resources Board] will decide on February 15, 1989, whether or not any modification to the LCS permit should be approved.
(3) Following the determination of the [Water Resources Board] with respect to any engineering recommendations from the representatives of DNR and LCS, the public shall be given the opportunity to comment on the permit during a thirty-day comment period which shall follow the publication of notice of the permit in a newspaper of general circulation in Berkeley County, West Virginia. Such comments shall be directed to the [Water Resources Board] at its Charleston office. After receipt of public comment, the [Water Re-

ary 25, 1989 order, the Water Resources Board found "that the uncontradicted evidence is that the LCS application is 'technically sound' and in compliance with the applicable laws and regulations in effect on February 3, 1988."

Therefore, the LCS had a valid permit on January 25, 1989, which could only be taken away if one of the four conditions listed above were not met. Site approval by the Solid Waste Authority was not one of the conditions listed in the Water Resources Board's order because, at the time the permit was granted, there were no statutes, other than *W.Va.Code*, 20–5F–4a [1988] (which relates to Class A facilities), in existence which required site approval.

Subsequent to the January 25, 1989 order, but prior to LCS's permit becoming final, *W.Va.Code*, 20–9–12a and 20–9–12b were enacted, to be effective on April 9, 1989. These two *Code* sections involved site approval by the local Solid Waste Authority.

*W.Va.Code*, 20–9–12a [1989] mandates that county or regional solid waste authorities prepare and complete a solid waste siting plan for the county or counties within their jurisdictions. *W.Va.Code*, 20–9–12a(e) [1989] further provides, in relevant part, that when the siting plan is approved

it shall be unlawful for any person to establish, construct, install or operate a commercial solid waste landfill ... not authorized by the siting plan: Provided, That *an existing commercial solid waste landfill ... which, on the effective date of this section [April 8, 1989], held a valid solid waste permit ... may continue to operate* but may not expand the spatial land area of the said facility beyond that authorized by said solid waste permit ..., and may not increase the aggregate monthly solid waste capacity in excess of ten thousand tons monthly unless such a facility is authorized by the siting plan.

(emphasis added). Therefore, *W.Va.Code*, 20–9–12a [1989] recognizes that existing solid

waste facilities which hold valid permits may continue to operate.

However, if a person wishes to operate a solid waste facility which is not in existence or which does not have a valid permit, *W.Va. Code*, 20–9–12b [1989] provides a mechanism for interim siting approval until the siting plan provided for in *W.Va.Code*, 20–9–12a [1989] is implemented. *W.Va.Code*, 20–9–12b(a) [1989], in pertinent part, requires a certificate of site approval to be issued by the county or regional solid waste authority before a solid waste facility may be constructed or expanded; however, "no such certificate will be required for such an existing commercial solid waste facility which on the effective date of this section [April 9, 1989] held a valid solid waste permit ... unless such facility increases its spatial land area beyond that authorized by such solid waste permit[.]"

■■■ The question before us is whether *W.Va.Code*, 20–9–12b [1989] mandates that LCS seek a certificate of site approval from the Solid Waste Authority before it may operate its solid waste facility. *W.Va.Code*, 20–9–12b [1989] does not apply to LCS because it had a valid permit on the date the above statute was enacted: April 9, 1989. As we pointed out earlier, the fact that the permit issued in January of 1989 was subject to four conditions does not prevent LCS from holding a valid permit because the conditions did not include site approval by the Solid Waste Authority. In fact, in January of 1989, site approval was not even an issue. Additionally, since the conditions were met, and no party appealed the September 1989 final permit, the appellees cannot now complain about the permit which was issued to LCS:

' "The general rule is that where an administrative remedy is provided by statute or by rules and regulations having the force and effect of law, relief must be sought from the administrative body, and such remedy must be exhausted before the courts will act." Syl. pt. 1, *Daurelle v. Traders Federal Savings & Loan Associa-*

sources Board] will decide whether or not any further [Water Resources Board] orders should be entered.

(4) A final order in this appeal shall be entered following the public comment period

provided for herein. This order and such other orders as may be issued prior to the final order are interlocutory.

*tion,* 143 W.Va. 674, 104 S.E.2d 320 (1958).' Syl. pt. 1, *Cowie v. Roberts,* 173 W.Va. 64, 312 S.E.2d 35 (1984).

Syl. pt. 1, *Hechler v. Casey,* 175 W.Va. 434, 333 S.E.2d 799 (1985). Therefore, since LCS had a valid permit as of January 1989, it was an existing landfill rendering *W.Va.Code,* 20–9–12b [1989] inapplicable. Although the trial judge concluded that this is not an existing facility under the language of *W.Va.Code,* 20–9–12b [1989], such conclusion ignores the reality of this case considering the extensive litigation on this issue. There must be finality to the process required to obtain a permit to operate a solid waste facility.

■ Moreover, under principles of retroactivity, *W.Va.Code,* 20–9–12b [1989] should not apply to LCS. In syllabus point 4 of *Arnold v. Turek,* 185 W.Va. 400, 407 S.E.2d 706 (1991) this Court stated: " ' "A statute is presumed to operate prospectively unless the intent that it shall operate retroactively is clearly expressed by its terms or is necessarily implied from the language of the statute." Syllabus Point 3, *Shanholtz v. Monongahela Power Co.,* [165 W.Va. 305], 270 S.E.2d 178 (1980).' Syllabus Point 2, *State ex rel. Manchin v. Lively,* 170 W.Va. 672, 295 S.E.2d 912 (1982)."

■ Both *W.Va.Code,* 20–9–12a and 20–9–12b [1989] clearly indicate that *W.Va.Code,* 20–9–12b [1989] should apply prospectively since the language of these two *Code* sections states that existing solid waste facilities with valid permits may continue to operate and are exempt from obtaining site approval from the regional or county solid waste authority. Furthermore, as we previously stated, at the time the permit was issued in January, there were no other statutory requirements which LCS had to meet before it could construct and operate its landfill. Therefore, LCS had a right to rely on the issuance of that permit.

■ This Court has reasoned that reliance is an important factor to consider when determining whether or not a statute applies retroactively:

In determining whether a statute should be applied retroactively perhaps the most fundamental principle to which we look is reliance since a person should be able to plan his conduct with reasonable certainty. The traditional analysis invoked in determining the legitimacy of a statute's application is whether the statute abrogates a 'vested' right. Since the vested right analysis tends to be as conclusory as the substantive/procedural analysis the better test is whether the individual has changed his position in reliance upon existing law, or whether the retrospective act defeats the reasonable expectations of the parties it affects.

*Pnakovich v. SWCC,* 163 W.Va. 583, 589–90, 259 S.E.2d 127, 130 (1979) (footnotes omitted). *See also Mildred L.M. v. John O.F.* 192 W.Va. 345, 351 n. 10, 452 S.E.2d 436, 442 n. 10 (1994) ("To determine retroactivity, a court must ascertain the nature of the right involved and must ask whether the right affected by the new legislation is remedial, substantive, or vested. If the right impinged is substantive or vested, it is usually protected from a retroactive application of the statute.") and *Lester v. State Compensation Commissioner,* 123 W.Va. 516, 521, 16 S.E.2d 920, 923–24 (1941), *overruled on other grounds by Sizemore v. State Workmen's Compensation Commissioner,* 159 W.Va. 100, 219 S.E.2d 912 (1975) ("The rule against construing legislation as retroactive is somewhat relaxed in cases where it is classed as remedial, or affects procedure only. . . . But even where the legislation affects procedure only, it cannot be made retroactive when the effect will be 'to impair the obligation of contracts or to disturb vested rights.' " (citation omitted)).

Accordingly, in the case before us, we find that LCS had a reasonable expectation to rely on the permit issued in January of 1989. Therefore, *W.Va.Code,* 20–9–12b, which was effective in April of 1989, does not apply to LCS. LCS had a valid permit and was, therefore, exempt from having to obtain site approval from the Solid Waste Authority.[9]

9. LCS notes in its brief before this Court that there are at least 18 other Class B solid waste facilities which have been operating without re-

ceiving any site approval from either a county commission or a county solid waste authority. The Division of Environmental Protection notes

We emphasize that our holding today is limited to the case before us considering the unique procedural history of this case. Based on the above, the order of the circuit court is affirmed, in part, and reversed, in part.

Affirmed, in part, reversed, in part.

BROTHERTON, C.J., did not participate.

MILLER, Retired Justice, sitting by temporary assignment.

in its brief that a number of Class B solid waste facilities have received local approval only by being included in commercial solid waste facili- ties siting plans prepared by the solid waste authorities.