461 S.E.2d 850

**LAWYER DISCIPLINARY BOARD, Complainant**

v.

**Darrell V. McGRAW, Jr., a Member of the West Virginia State Bar, Respondent.**

No. 22639.

Supreme Court of Appeals of West Virginia.

Submitted March 7, 1995.

Decided June 19, 1995.

Sherri D. Goodman, Chief Disciplinary Counsel, Charleston, for complainant.

James B. Lees, Hunt, Lees, Farrell & Kessler, Charleston and Robert M. Bastress, Jr., Morgantown, for respondent.

McHUGH, Chief Justice:

In this lawyer disciplinary proceeding, the Lawyer Disciplinary Board for the State of

West Virginia (hereinafter "Board")[1] has found that the respondent, Darrell V. McGraw, Jr., a member of the West Virginia State Bar and the Attorney General of the State of West Virginia, violated Rule 1.6(a) of the *Rules of Professional Conduct.* The Board recommends that this Court publicly reprimand respondent in open court, pursuant to Rule 3.15 of the Rules of Lawyer Disciplinary Procedure.[2] For the reasons stated below, we adopt the Board's recommendation and order that respondent be publicly reprimanded. We further order that respondent pay $1,713.56 for the costs incurred for this disciplinary proceeding.[3]

## I.

On January 15, 1994, a Statement of Charges was issued against respondent by the Hearing Panel of the Committee on Legal Ethics of the West Virginia State Bar (hereinafter the "Committee"), charging respondent with two violations of Rule 1.6(a) of the *Rules of Professional Conduct* as well as

one violation each of Rule 1.7(b) and Rule 1.2(a). In a written response to the Committee, respondent, through counsel, denied the charges. Following hearings on the matter, held on April 6, 1994 and April 29, 1994, the Full Hearing Panel of the Lawyer Disciplinary Board, on November 12, 1994, adopted the hearing panel subcommittee's findings of fact, conclusions of law and recommendation concerning discipline.

## A.

The underlying litigation giving rise to this disciplinary proceeding began in 1990 when the Division of Natural Resources, by its attorney, the Office of Attorney General, instituted two declaratory judgment actions in Berkeley County Circuit Court against LCS Services, Inc. (hereinafter "LCS"), Chambers of West Virginia, Inc., and Chambers Development Company, Inc.[4] Following governmental reorganization, the powers, functions and duties previously performed by the Division of Natural Resources were transferred

---

**1.** Article VI of the By–Laws of the West Virginia State Bar, **Procedure for Disciplining, Suspending and Disbarring Attorneys at Law,** was superseded by the Rules of Lawyer Disciplinary Procedure, effective July 1, 1994. As a result of these new rules, it is now the Lawyer Disciplinary Board, and no longer the Committee on Legal Ethics, which investigates complaints of violations of the *Rules of Professional Conduct* and which takes appropriate action in accordance with the Rules of Lawyer Disciplinary Procedure.

The hearings in this matter were conducted on April 6, 1994 and April 29, 1994, before the Rules of Lawyer Disciplinary Procedure became effective. Thus, the hearings were heard before the Hearing Panel of the Committee on Legal Ethics. By the time the findings of fact, conclusions of law and recommendation concerning discipline were prepared, the Rules of Lawyer Disciplinary Procedure had become effective and, consequently, it was the Full Hearing Panel of the Lawyer Disciplinary Board which deliberated the matter and made recommendations to this Court. We shall use the aforementioned terms as they existed at various phases of these proceedings.

**2.** Rule 3.15 of the Rules of Lawyer Disciplinary Procedure provides:

**Rule 3.15.** *Permissible Sanctions.* A Hearing Panel Subcommittee may recommend or the Supreme Court of Appeals may impose any one or more of the following sanctions for a violation of the Rules of Professional Conduct or pursuant to Rule 3.14: (1) probation; (2)

restitution; (3) limitation on the nature or extent of future practice; (4) supervised practice; (5) community service; (6) admonishment; (7) reprimand; (8) suspension; or (9) annulment. When a sanction is imposed, the Hearing Panel Subcommittee or the Court shall order the lawyer to reimburse the Lawyer Disciplinary Board for the costs of the disciplinary proceeding unless the Panel or the Court finds the reimbursement will pose an undue hardship on the lawyer. Willful failure to reimburse the Board may be punished as contempt of the Court.

Former article VI, § 20 of the By–Laws of the West Virginia State Bar provided that "[i]f the court determines that the attorney should receive a public reprimand, the same shall be administered by the chief justice *in open court.*" (emphasis added). The Rules of Lawyer Disciplinary Procedure, however, do not require that a disciplined attorney be publicly reprimanded "in open court."

**3.** *See* Rule 3.15 of the Rules of Lawyer Disciplinary Procedure, *supra.*

**4.** The litigation underlying this disciplinary proceeding has a complex procedural history. For purposes of this opinion, we shall recount only that which is relevant to the resolution of this case. A more detailed account of this litigation may be found in *State ex rel. Hamrick v. LCS Services, Inc.,* 186 W.Va. 702, 414 S.E.2d 620 (1992) and *State ex rel. Hamrick v. LCS Services, Inc.,* 193 W.Va. 111, 454 S.E.2d 405 (1994).

to the Division of Environmental Protection of the Department of Commerce, Labor and Environmental Resources (hereinafter "DEP"), effective July 1, 1992.

The purpose of the consolidated declaratory judgment actions instituted by the DEP was (1) to prohibit LCS from accepting waste at their landfill in the town of Hedgesville in Berkeley County, West Virginia, until the landfill received site approval from the Berkeley County Solid Waste Authority and (2) to restrict the landfill from accepting more than 9,999 tons of solid waste per month, unless the Berkeley County Commission gave approval to exceed the 9,999 tons per month limit.

On June 19, 1992, the DEP filed a motion for summary judgment in which it requested that the Circuit Court of Berkeley County require LCS to apply for a certificate of site approval from the Berkeley County Solid Waste Authority and limit it to receiving no more than 9,999 tons of solid waste per month. The DEP's motion for summary judgment was granted on July 29, 1993.

Following the circuit court's decision on the DEP's motion for summary judgment, attorney Kim Brown Poland,[5] who serves as regulatory counsel for Chambers Development Company, Inc. (hereinafter "Chambers"), LCS' parent company, contacted the DEP and requested a meeting between the DEP and representatives of Chambers and LCS to discuss, in light of the July 29, 1993

order, the current status of the law concerning landfills like the LCS facility which accept 9,999 tons or less of solid waste per month.

A meeting was scheduled for August 12, 1993. David Callaghan, then Director of the DEP, asked the Deputy Director of the DEP, Ann Spaner,[6] to attend the meeting. Two representatives of the Office of Waste Management were also asked to attend. Director Callaghan testified that he did not ask counsel from the Office of Attorney General to attend the meeting because he understood the meeting to be about the possible sale of the landfill[7] and not about the landfill litigation.[8] Director Callaghan further testified that the fact that he was meeting with Ms. Poland and representatives of Chambers and LCS was not intended to be confidential.

At the August 12, 1993 meeting, held at the DEP's offices in Nitro, West Virginia, Ms. Poland advised Director Callaghan and Deputy Director Spaner that LCS had filed a motion, pursuant to Rule 59(e) of the *West Virginia Rules of Civil Procedure*, to amend, alter, correct, clarify and/or reconsider the circuit court's order granting the DEP's motion for summary judgment.[9] Director Callaghan and Deputy Director Spaner learned of LCS' Rule 59(e) motion for the first time at this meeting even though LCS had already filed it in Berkeley County Circuit Court. Director Callaghan told Ms. Poland that he would discuss LCS' motion[10] with

5. Ms. Poland was not counsel of record for either Chambers or LCS in the landfill litigation.

6. Assistant Attorney General Stephen Van Camp testified that he warned Deputy Director Spaner not to communicate with LCS without the Attorney General Office's approval or participation. However, Deputy Director Spaner denies that she was ever warned in that regard.

7. Director Callaghan testified that the DEP must approve any sale and any new permittees who assume responsibility for landfills in West Virginia.

8. Director Callaghan testified that he had previously met with Ed Wiles and Dusty Williams, of Chambers and LCS, respectively, who had indicated that they were considering selling the Berkeley County landfill. Ms. Poland testified that the purpose of the meeting, as communicated to the DEP prior thereto, was to discuss, in light of the circuit court's July 29, 1993 order,

the requirements of the LCS landfill. However, Ms. Poland further testified that the potential sale of the LCS facility was also discussed.

9. Neither Director Callaghan nor Deputy Director Spaner had been furnished a copy of either the motion for summary judgment filed on the DEP's behalf by the Attorney General's Office or the circuit court's order granting said motion. Ms. Poland had a copy of the motion for summary judgment with her at the meeting. A copy of it was made for Director Callaghan and Deputy Director Spaner.

10. The essence of LCS' Rule 59(e) motion was that the relevant statutory siting provision requires siting approval for Class A landfills and Class B landfills seeking to be upgraded to Class A status. It was LCS' contention that theirs was a Class B landfill not fitting either of these categories and that such facilities have typically obtained site approval by virtue of their inclusion in

litigation counsel from the Attorney General's office. The Lawyer Disciplinary Board found that Director Callaghan was not asked to join in LCS' motion nor did he then agree to do so.

At the direction of Director Callaghan, Deputy Director Spaner immediately contacted the DEP's litigation counsel, Assistant Attorney General Stephen Van Camp, to tell him about the meeting and that the reason he had not been asked to attend was due to Director Callaghan's now mistaken belief that the meeting was to be about the sale of the landfill and not the landfill litigation. Though Assistant Attorney General Van Camp testified that Deputy Director Spaner directed him to join in LCS' Rule 59(e) motion, Deputy Director Spaner testified that she only wanted to raise the issue with him for discussion. Whichever the case, the Board found that it was, nevertheless, reasonable for Assistant Attorney General Van Camp to conclude that the DEP had changed its position on the issue of whether LCS should be required to obtain local site approval for its landfill.

On August 12, 1993, the same day as the aforementioned meeting and subsequent conversation between Deputy Director Spaner and Assistant Attorney General Van Camp, respondent determined that the Office of Attorney General could no longer represent the DEP in the landfill litigation, considering the DEP had, in the respondent's view, changed its position on the site approval requirement.

Also on that day, respondent telephoned Christina Hogbin, a Berkeley County resident who lives two miles from the landfill and who had attended hearings on the landfill and had followed the DEP's lawsuit against LCS.[11] Chief Disciplinary Counsel Sherri Goodman, in a letter to respondent concerning the ethics complaint which had been filed against him, asked him about his conversation with Ms. Hogbin. In a written response, respondent, through counsel, stated:

> General McGraw called Ms. Hogbin (for whom he is a trustee) on August 12, 1993, and informed her that Director Callaghan had decided to resist at least part of [Berkeley County] Judge Wilkes's order granting summary judgment to the [DEP] and that Mr. Callaghan wanted the Office of the Attorney General to support the request of LCS Services (LCS) for reconsideration. Ms. Hogbin asked what she and her group of citizens could do. General McGraw suggested to her that, as DEP had made a political decision, the only effective way to alter it was through the political process, and that meant persuading their legislators to attempt to influence the Governor and DEP.

Respondent testified that his response to Chief Disciplinary Counsel's question was a demurrer and that, if in fact he did suggest to Ms. Hogbin and her fellow citizen activists that they contact their legislators, he had the right to do so.[12] Furthermore, in his Answer to the Statement of Charges, respondent, through counsel, stated:

> n. Upon being apprised of [the DEP's change in position concerning site approval for the landfill], the Attorney General determined that such an order from DEP was repugnant, immoral, unethical, and totally improper. The Attorney General further determined that he would be unable to adequately represent DEP as required

---

a county's solid waste disposal plan. Thus, LCS' facility should not be held to a siting standard different than that applied to other Class B facilities around the state.

11. Ms. Hogbin's husband serves on the Berkeley County Solid Waste Authority, a party to the landfill litigation. Despite some confusion on this issue, she is *not* a member of Citizens United to Rescue the Environment ("CURE"), an intervenor in the litigation. Ms. Hogbin testified that she is a member of the West Virginia Environmental Council and that she had previously met respondent on July 21, 1993 when she and fourteen other environmental activists from around the State met with him concerning the landfill litigation. Specifically, Ms. Hogbin and the others presented respondent with a signed petition demanding that he remove Assistant Attorney General Van Camp from the litigation for the reason that Mr. Van Camp had, at a previous hearing in Berkeley County, referred to the landfill as "state-of-the-art" and a part of the state's waste management plan. Ms. Hogbin's group apparently viewed this remark as an endorsement of the landfill. However, respondent refused to remove Mr. Van Camp from the case.

12. Respondent testified that he did not recall this portion of his conversation with Ms. Hogbin.

by law because such representation would create conflicts and/or adversity. The Attorney General further decided that he must therefore withdraw from such representation and appoint a prosecuting attorney to represent DEP consistent with W.Va. Code § 5–3–2 and the direction of the West Virginia Supreme Court in *Manchin v. Browning,* [170 W.Va. 779, 296 S.E.2d 909 (1982)].

o. The Attorney General communicated his position to Chris Hogbin, an intervenor in the case.[13] (The Office of Attorney General had previously received permission from the attorney for the intervenors to communicate directly with the intervenors.) Absolutely no privileged information or client confidential information was given to either the attorney for the intervenors or Ms. Hogbin, as the order given to the Office of the Attorney General by [Deputy Director] Spaner was to *publicly* file a pleading in the Circuit Court of Berkeley County on behalf of DEP so as to advise the Court of the change in position of DEP.

(footnote added).

Ms. Hogbin, on the other hand, testified that respondent told her that there had been a "closed-door meeting" between Director Callaghan, Deputy Director Spaner and Ms. Poland, without a representative of the Office of Attorney General. However, Ms. Hogbin testified that she did not recall respondent telling her about the DEP's change in position. She testified that it was Norman Steenstra, of the West Virginia Environmental Council, who told her about it and who suggested that they call legislators.

Respondent testified that he telephoned Ms. Hogbin without consulting with Director Callaghan or Deputy Director Spaner to verify that the DEP had changed its position on whether LCS was required to get local site approval for its landfill. He testified that it is his policy to communicate with clients—in this case, the DEP—in writing only and that he already had a public document directing

him to "do certain things." Though respondent believed there was a document from the DEP directing Assistant Attorney General Van Camp to take a certain position on behalf of the DEP, no such document has been offered in this disciplinary proceeding.

Director Callaghan testified that soon after the August 12, 1993 meeting, he received inquiries from various legislators concerning the DEP's change in position on the landfill. He and Deputy Director Spaner were also accused, by an attorney for the intervenors in the landfill litigation, of "corrupt collusion."

Director Callaghan subsequently met with respondent on August 16, 1993, along with the managing committee of the Office of Attorney General, Fran Hughes, Deborah McHenry and Tom Morgan. Director Callaghan had scheduled the meeting due to his concern that his attorney, the respondent, had committed an ethical breach. At the meeting, respondent told Director Callaghan that the *Manchin, supra*[14] case needed "revisiting" and that respondent's calling to the public was higher than his duty to the DEP. When respondent asked Director Callaghan to explain the DEP's position on the landfill issue, Director Callaghan responded that the DEP had not yet taken a position.

On August 20, 1993, Deputy Attorney General William Adams informed Director Callaghan, by letter, that he intended to file, on behalf of the DEP, a response to LCS' Rule 59(e) motion which would oppose LCS' motion and *support* the circuit court's summary judgment order of July 29, 1993.[15] Director Callaghan testified that he then telephoned Deputy Attorney General Adams and instructed him not to file any response unless the DEP approved it.

On August 25, 1993, Deputy Attorney General Adams prepared a memorandum to the management committee of the Office of Attorney General. The memorandum indicated that a lawyer could, in good faith and in

**13.** In fact, Ms. Hogbin is *not* an intervenor in the landfill litigation. *See* n. 11, *supra.*

**14.** The *Manchin* decision discusses the powers and duties of the Attorney General to represent

state officials in civil actions. *See* discussion, *infra.*

**15.** A hearing on LCS' Rule 59(e) motion was scheduled for August 31, 1993.

conformance with Rule 11 of the *West Virginia Rules of Civil Procedure,* advance the DEP's argument that LCS should not be required to obtain site approval from the Berkeley County Solid Waste Authority.[16] Additionally, Assistant Attorney General David Lahr testified that after speaking with Deputy Director Spaner, he became convinced that he could advocate the DEP's position.

On August 26, 1993, five days before the hearing on LCS' Rule 59(e) motion, Deputy Director Spaner learned that respondent intended to withdraw as counsel for the DEP in its litigation with LCS. Though she offered to explain the DEP's legal position to respondent or the managing committee, her offer was refused. Similarly, when Deputy Director Spaner, a lawyer and active member of the West Virginia State Bar, requested that she be appointed special assistant attorney general to represent the DEP at the August 31, 1993 hearing, her request was denied by respondent.

The next day, respondent, by Deputy Attorney General Adams, filed consolidated motions to withdraw as the DEP's counsel and for a continuance. The motion to withdraw was based upon an "irreconcilable difference ... between the Attorney General's Office and the [DEP] of such magnitude that the Attorney General's Office ... is unable in good conscience to continue as counsel in this instant matter[.]" Attached to the motion was a draft of a memorandum, previously prepared by Deputy Director Spaner, in response to LCS' Rule 59(e) motion. The memorandum set forth the DEP's position that, as a Class B facility not seeking to convert to a Class A facility, LCS has satisfied the statutory siting requirements. The memorandum, which had neither been seen nor approved by Director Callaghan, was attached to the motion to withdraw without the DEP's consent.

On August 30, 1993, respondent appointed the Prosecuting Attorney of Pendleton County, Jerry Moore, to replace the Office of Attorney General in the DEP's litigation with LCS even though Prosecutor Moore had no experience in solid waste litigation. In a letter to Judge Christopher C. Wilkes of the Circuit Court of Berkeley County, dated August 30, 1993, Director Callaghan protested this appointment and the respondent's motion to withdraw.

At the August 31, 1993 hearing, the circuit court denied the respondent's motion to withdraw as counsel for the DEP and further, denied LCS' motion to amend, alter, correct, clarify and/or reconsider its July 29, 1993 order.[17]

## B.

An ethics complaint was filed against respondent by Director Callaghan. Upon review of the resulting investigative file, the Investigative Panel of the Committee on Legal Ethics found there to be good cause to file charges against respondent. The matter was then referred to the Hearing Panel of the Committee on Legal Ethics. A Statement of Charges was subsequently filed on January 15, 1994, charging respondent with four ethical violations.

### Charge One

By contacting Christina Hogbin and revealing information he learned from his client, respondent violated Rule 1.6(a) of the *Rules of Professional Conduct.* Rule 1.6(a), Confidentiality of Information, states that

[a] lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly au-

---

**16.** We point out, however, that Deputy Attorney General Adams also stated in the memorandum his belief that the respective legal positions of the DEP and the Office of Attorney General were conflicting and irreconcilable. His ultimate recommendation to the managing committee was that a special assistant attorney general be appointed to represent the DEP and that such special assistant *not* be a current assistant attorney general.

**17.** *See State ex rel. Hamrick v. LCS Services, Inc.,* 193 W.Va. 111, 454 S.E.2d 405 (1994), wherein this Court ultimately ruled that LCS was not required to obtain specific site approval from the Berkeley County Solid Waste Authority in order to continue the operation of its landfill.

thorized in order to carry out the representation, and except as stated in paragraph (b).[18]

(footnote added).

### Charge Two

By encouraging Ms. Hogbin to apply political pressure to legislators as a means of opposing the DEP's position, respondent took a position adverse to his client, in violation of Rule 1.7(b) of the *Rules of Professional Conduct.* Rule 1.7(b), Conflict of Interest, provides, in relevant part: "A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or the lawyer's own interests[.]"

### Charge Three

By refusing to advocate the DEP's position on the issue of whether LCS should be required to obtain site approval, respondent violated Rule 1.2(a) of the *Rules of Professional Conduct.* Rule 1.2(a), Scope of Representation, states, in pertinent part: "A lawyer shall abide by a client's decisions concerning the objectives of representation ... and shall consult with the client as to the means by which they are to be pursued."

### Charge Four

By directing that a copy of the DEP's draft memorandum, an in-house document, be attached to respondent's motion to withdraw, respondent violated Rule 1.6(a). *See* Charge One, *supra.* On April 16, 1994, at the conclusion of the presentation of the State Bar's evidence, the Hearing Panel dismissed this charge upon finding that the State Bar had failed to meet its burden of proof. The evidence revealed that it was Assistant Attorney General Adams who at-

tached the DEP's draft memorandum, without respondent's consent.

### C.

On November 12, 1994, following presentation of all the evidence, the Full Hearing Panel of the Lawyer Disciplinary Board adopted the subcommittee's findings of fact, conclusions of law and recommendation concerning discipline. The Board found that the State Bar failed to meet its burden of proof on Charge Two, which alleged that respondent violated Rule 1.7(b), Conflict of Interest. The Board further found that respondent did not violate, as alleged in Charge Three, Rule 1.2(a), which requires counsel to abide by a client's decisions.

Specifically, the Board found, in relation to Charge Two, that the State Bar failed to prove that respondent encouraged Ms. Hogbin to apply pressure to legislators as a means of opposing the DEP's decision to support LCS' Rule 59(e) motion to amend, alter, correct, clarify and/or reconsider the circuit court's order granting the DEP's motion for summary judgment. She testified that it was West Virginia Environmental Council member Norman Steenstra, and not respondent, who suggested that she contact legislators for the purpose of opposing the DEP's position. Thus, the Board found that the State Bar failed to prove that respondent violated Rule 1.7(b), as alleged in Charge Two.[19]

The Board further found, in relation to Charge Three, that respondent did not violate Rule 1.2(a) when he refused to espouse the DEP's position to support LCS' Rule 59(e) motion. The Board determined that:

Notwithstanding the representations of Deputy Attorney General Adams and Assistant Attorney General Lahr that the position of DEP could be articulated in good faith without contravening Rule 11 of

---

**18.** Paragraph (b) of Rule 1.6 states:

A lawyer may reveal such information to the extent the lawyer reasonably believes necessary:

(1) to prevent the client from committing a criminal act; or

(2) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a

criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of a client.

**19.** The Board points out that, had the allegations been proven, they would clearly constitute a violation of Rule 1.7(b).

the West Virginia Rules of Civil Procedure, Respondent is the decision maker and charged with responsibility for the [Attorney General's] office and all its decisions. He sets the tone of the practice and it is his judgment that is critical. He determined that continued representation of DEP, in light of his understanding of its position, was untenable. He is permitted by Rule 1.16 [of the Rules of Professional Conduct] to withdraw, so long as such withdrawal will not prejudice the interests of his client. It is not contended the attempted withdrawal caused any prejudice to DEP. Here the record is clear that Respondent petitioned to withdraw as counsel for DEP, sought a continuance to allow new counsel to become familiar with the matter and, as authorized by law[,] appointed new counsel for DEP.

Finally, as indicated above, the Board concluded that the evidence showed that respondent telephoned Ms. Hogbin and told her of the August 12, 1993 meeting between Director Callaghan, Deputy Director Spaner and LCS and Chambers and that neither the respondent nor any member of his staff was present at the meeting.[20] Respondent further advised her of what he perceived to be a change in the DEP's position regarding whether LCS should be required to obtain local site approval for its landfill. Respondent neither consulted nor obtained the consent of Director Callaghan before contacting Ms. Hogbin.

The Board found that respondent's disclosure to Ms. Hogbin of the DEP's change in position—whether such a change in position had in fact occurred—was "a disclosure of a client's strategy interests obtained by reason of representation and as such a violation of Rule 1.6(a)." The Board reasoned that "[c]lients frequently will articulate various positions on matters to their lawyer. It is the function of a lawyer to listen to the views of the client and counsel with the client about how best to achieve the end the client wishes to achieve." The Board thus concluded that "[t]o disclose information relating to a possible change of position to anyone, especially

one whose known views were antagonistic to the policy decisions of DEP, is a disclosure of client confidence[,]" and violative of Rule 1.6(a) of the *Rules of Professional Conduct.*

## II.

### A.

■ At the outset, we point out that Rule 3.7 of the Rules of Lawyer Disciplinary Procedure sets forth the standard by which the office of disciplinary counsel must prove ethics charges against a member of the Bar. Rule 3.7 states: *"Standard of Proof.* In order to recommend the imposition of discipline of any lawyer, the allegations of the formal charge must be proved by clear and convincing evidence."

This standard of proof is required in many jurisdictions. *See Huckaby v. Alabama State Bar,* 631 So.2d 855 (Ala.1993); *In re Higgins,* 180 Ariz. 396, 884 P.2d 1094 (1994); *People v. Robnett,* 859 P.2d 872 (Colo.1993); *Weiss v. Statewide Grievance Comm.,* 227 Conn. 802, 633 A.2d 282 (1993); *In re Heamon,* 622 N.E.2d 484 (Ind.1993); *In re Quaid,* 646 So.2d 343 (La.1994); *Attorney Grievance Comm'n of Maryland v. Kemp,* 335 Md. 1, 641 A.2d 510 (1994); *In re Disciplinary Action Against Selmer,* 529 N.W.2d 684 (Minn. 1995); *Mississippi Bar v. Attorney R.,* 649 So.2d 820 (Miss.1995); *State ex rel. Nebraska State Bar Ass'n. v. Schmeling,* 247 Neb. 735, 529 N.W.2d 799 (1995); *In re Magid,* 139 N.J. 449, 655 A.2d 916 (1995); *In re Goetz,* 474 N.W.2d 29 (N.D.1991); *State ex rel. Oklahoma Bar Ass'n. v. Copeland,* 870 P.2d 776 (Okla.1994); *In re Whipple,* 320 Or. 476, 886 P.2d 7 (1994); *In re Illuzzi,* 160 Vt. 474, 632 A.2d 346 (1993). *Accord In re Pauley,* 173 W.Va. 228, 314 S.E.2d 391 (1983) (allegations in judicial disciplinary proceeding must be proved by clear and convincing evidence).

This Court has previously required that ethics charges be proved by "full, preponderating and clear evidence." *See* syl. pt. 1, *Committee on Legal Ethics v. Walker,* 178 W.Va. 150, 358 S.E.2d 234 (1987); syl. pt. 1, *Committee on Legal Ethics v. Tatterson,* 177 W.Va. 356, 352 S.E.2d 107 (1986); syl. pt. 1,

---

**20.** The Board found that respondent's disclosure of the fact that this meeting took place was *not* a

violation of Rule 1.6(a) because such fact was never considered to be confidential.

*Committee on Legal Ethics v. Tatterson,* 173 W.Va. 613, 319 S.E.2d 381 (1984); syl. pt. 1, *Committee on Legal Ethics v. Pence,* ——— W.Va. ———, 216 S.E.2d 236 (1975). Rule 3.7 of the Rules of Lawyer Disciplinary Procedure, effective July 1, 1994, requires the Office of Disciplinary Counsel to prove the allegations of the formal charge by clear and convincing evidence. Prior cases which required that ethics charges be proved by full, preponderating and clear evidence are hereby clarified.

### B.

 In syllabus point 3 of *Committee on Legal Ethics v. McCorkle,* 192 W.Va. 286, 452 S.E.2d 377 (1994), we articulated the following standard of judicial review of lawyer disciplinary proceedings:

A *de novo* standard applies to a review of the adjudicatory record made before the [Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Board's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

### C.

Applying the aforementioned principles to the facts before us, we conclude that respondent violated Rule 1.6(a) of the *Rules of Professional Conduct* when he voluntarily disclosed client information. We further conclude that respondent did not violate Rules 1.7(b), as alleged in Charge Two; 1.2(a), as alleged in Charge Three; and 1.6(a), as alleged in Charge Four.

### III.

It is a fundamental principle in the client-lawyer relationship that the lawyer maintain the confidentiality of information relating to the representation, *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 721 (7th Cir.1982); Comment, Rule 1.6 of the *Rules of Professional Conduct,* so as to encourage the client "to communicate fully and frankly with the lawyer[.]" *Marano v. Holland,* 179 W.Va. 156, 170, 366 S.E.2d 117, 131 (1988); *Rules of Professional Conduct* 1.6 cmt. *See also United States v. Grand Jury Investigation,* 401 F.Supp. 361, 369 (W.D.Pa.1975).

There are two related bodies of law which embrace the principle of confidentiality: the ethical duty of confidentiality and the evidentiary attorney-client privilege. *Rules of Professional Conduct* 1.6 cmt. However, as discussed below, "[t]he [evidentiary] attorney-client privilege exists apart from, and is not coextensive with, the ethical confidentiality precepts." *United States v. Ballard,* 779 F.2d 287, 293 (5th Cir.1986) (footnote omitted).

 "The [evidentiary] attorney-client privilege applies in judicial and other proceedings in which a lawyer may be called as a witness or otherwise required to produce evidence concerning a client." *Rules of Professional Conduct* 1.6 cmt. *See State v. Burton,* 163 W.Va. 40, 254 S.E.2d 129 (1979); 1 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers,* § 5–4(E)(2)(e) (3d ed. 1994) ("An attorney-client privilege does not arise unless both parties contemplate that an attorney-client relationship does or will exist, advice is sought by the client from an attorney in his capacity as a legal adviser, and the communication between the attorney and client is intended to be confidential." (citation omitted)). This common law privilege, now incorporated into the *West Virginia Rules of Evidence,*[21] applies to compelled disclosures of confidences communicated by a client to his or her lawyer. 1 Cleckley, *supra* at § 5–1(C)(2); *X Corp. v. Doe,* 805 F.Supp. 1298, 1305 n. 12 (E.D.Va.1992), *aff'd Under Seal v. Under Seal,* 17 F.3d 1435 (4th Cir.1994); Geoffrey C. Hazard, Jr. and

---

21. *West Virginia Rules of Evidence* 501 states: "The privilege of a witness, person, government, state, or political subdivision thereof shall be governed by the principles of the common law except as modified by the Constitution of the United States or West Virginia, statute or court rule."

W. William Hodes, *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct,* § 1.6:103 (2d ed. 1994 Supp.). This privilege belongs to the client and not the lawyer. Thus, it is the client who "has the privilege to refuse to disclose and to prevent others from disclosing the information conveyed." *State ex rel. Doe v. Troisi,* 194 W.Va. 28, 459 S.E.2d 139, 146 (1995) (citation omitted). Therefore, as a general principle, if privileged communication is disclosed to third parties, then the attorney-client privilege is waived. Syl. pt. 12, *Marano, supra. See United States v. Jones,* 696 F.2d 1069 (4th Cir.1982) (disclosure inconsistent with confidential nature of attorney-client relationship waives attorney client privilege.)

■ In contrast, the lawyer's broader ethical duty of confidentiality, embodied in Rule 1.6, "applies in situations other than those where evidence is sought from the lawyer through compulsion of law. The confidentiality rule applies not merely to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source." Comment, Rule 1.6 of the *Rules of Professional Conduct.* Significantly, the duty of confidentiality binds the lawyer at *all* times, not only in cases where he or she faces inquiry from others. Hazard, *supra* § 1.6:108.

In determining whether the attorney-client privilege prohibited an attorney from further representation of a former joint client, the court in *Brennan's, Inc. v. Brennan's Restaurants, Inc.,* 590 F.2d 168 (5th Cir.1979), held that because confidences cannot arise between joint clients, a former joint client may not assert the evidentiary attorney-client privilege as to matters concerning the former joint representation. However, joint clients are afforded the broader ethical duty of confidentiality:

'Information ... acquired [from a client] is sheltered from use by the attorney against his client by virtue of the existence of the attorney-client relationship. This is true without regard to whether someone else may be privy to it. *NCK Organization v. Bregman,* 542 F.2d 128, 133 (2d Cir.1976). The obligation of an attorney not to misuse information acquired in the course of representation serves to vindicate the trust and reliance that client's place in their attorneys. A client would feel wronged if an opponent prevailed against him with the aid of an attorney who formerly represented the client in the same matter ... this would undermine public confidence in the legal system as a means for adjudicating disputes.'

*X Corp.,* 805 F.Supp at 1307 (*quoting Brennan's, Inc.,* 590 F.2d at 172).

It has been further held that "the client's privilege in confidential information disclosed to his attorney 'is not nullified by the fact that the circumstances to be disclosed are part of a public record, or that there are other available sources for such information, or by the fact that the lawyer received the same information from other sources.'" *Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562, 572–73 (2d Cir.1973) (*quoting* Henry H. Drinker, *Legal Ethics* 135 (1953)) (plaintiff's counsel disqualified on ground that he previously represented part owner of corporate defendant where issue involved whether defendant's part owner controlled defendant and used that control for an illegal purpose.) After all, the essence of the attorney-client relationship is that of trust, reliance and loyalty. Failure to safeguard it would undermine public confidence in the legal system.[22] Though the aforementioned cases concern former joint clients, we, nevertheless, find their reasoning to be compelling.[23]

Respondent emphasizes that representatives from LCS and Chambers and their counsel were present at the meeting where Director Callaghan allegedly determined that the DEP would change its position on the

---

**22.** *See Committee on Legal Ethics v. Walker,* 178 W.Va. 150, 358 S.E.2d 234 (1987); *X Corp., supra; The Florida Bar v. McCain,* 330 So.2d 712 (Fla.1976); *E.F. Hutton & Company, Inc. v. Brown,* 305 F.Supp 371 (S.D.Tex.1969).

**23.** Though Ms. Hogbin happened to be philosophically united with the DEP in its lawsuit against LCS, her interest in the litigation is irrelevant as to whether respondent breached his duty of confidentiality to his client.

site approval issue and join in LCS' Rule 59(e) motion. Thus, according to respondent, he did not disclose anything to Ms. Hogbin which was not already disclosed, by his own client, to LCS and Chambers.

Respondent further maintains that his office was instructed to file a Rule 59(e) motion, a public pleading. Thus, he contends that his disclosure of the DEP's change in position on the site approval issue was "impliedly authorized in order to carry out the representation[.]" Rule 1.6(a) of the *Rules of Professional Conduct.*

Finally, respondent argues that, under the Freedom of Information Act, *W.Va.Code,* 29B–1–1, *et seq.,* (hereinafter "FOIA") the DEP, as a state agency discussing the interpretation of a statute, would have been required to disclose to any inquiring citizen all notes, memoranda and other documents generated by or related to the August 16, 1993 meeting.

In essence, then, respondent argues that he did not breach his ethical duty of confidentiality because the information he disclosed to Ms. Hogbin had been previously revealed or "made public." We disagree. Clearly, respondent has confused the evidentiary attorney-client privilege with the ethical duty of attorney-client confidentiality.

Under the facts of this case, it is arguable that the information disclosed to Ms. Hogbin was not protected by the evidentiary attorney-client privilege. *See State v. Burton, supra; United States v. (Under Seal),* 748 F.2d 871 (4th Cir.1984). *See also Marano v. Holland, supra; United States v. Jones, supra.* In that this issue is not presently before this Court, we decline to address it.

■ However, by disclosing to Ms. Hogbin client information communicated at the meeting, respondent has breached his ethical duty of confidentiality. In so doing, he has violated Rule 1.6(a) of the *Rules of Profes-*

*sional Conduct,* which prohibits "voluntary disclosures except when made with the consent of the client or in the furtherance of the legal representation, in which case client consent may be fairly inferred." Hazard, *supra* § 1.6:108 (footnote omitted). The ethical duty of confidentiality protects more than just "confidences" and "secrets" of a client in that Rule 1.6, entitled Confidentiality of Information, prohibits disclosures of *"information* relating to representation of a client[.]" (emphasis added). The use of the word "information" indicates that more than mere "confidences" are covered. *Anchor Packing Co. v. Pro–Seal, Inc.,* 688 F.Supp. 1215, 1218 (E.D.Mich.1988); *St. Albans Financial Co. v. Blair,* 559 F.Supp. 523, 526 (E.D.Pa.1983); *Brennan's, Inc.,* 590 F.2d at 172.[24] *Accord Harris v. Baltimore Sun,* 330 Md. 595, 625 A.2d 941 (1993).

■ We thus do not accept respondent's arguments. We fail to see how his voluntary disclosure to Ms. Hogbin, a third party, was impliedly authorized simply because respondent was directed to file, in the future, a public pleading, and how such disclosure furthered respondent's legal representation of his client. Furthermore, though respondent dimly asserts that the communication between Director Callaghan and LCS and Chambers was subject to public inspection under FOIA, he offers no legal authority for his position that FOIA either nullifies or supersedes his ethical duty of confidentiality.[25] Unlike the evidentiary attorney-client privilege recognized under *West Virginia Rules of Evidence* 501, a lawyer's ethical duty of confidentiality under Rule 1.6 of the *Rules of Professional Conduct* applies to all information relating to representation of a client, protecting more than just "confidences" or "secrets" of a client. The ethical duty of confidentiality is not nullified by the fact that the information is part of a public

---

24. Though these cases refer to what is now Rule 1.9 of the *Rules of Professional Conduct* ("A lawyer who has formerly represented a client ... shall not thereafter: ... (b) use *information* relating to the representation to the disadvantage of the former client" (emphasis added)), their conclusions apply equally to Rule 1.6(a). *See Anchor Packing,* 688 F.Supp. at 1218 n. 19.

25. Were Ms. Hogbin or anyone else interested in seeking information from the August 16, 1993 meeting, FOIA sets forth specific procedures for requesting and obtaining public records. *See W.Va.Code,* 29B–1–3 [1992]. However, whether the meeting was subject to public inspection under FOIA is not presently before this Court.

record or by the fact that someone else is privy to it.

## IV.

In *Manchin v. Browning, supra*, this Court discussed the Attorney General's powers and duties to represent state officials in civil actions.[26] We determined that the Attorney General should not exercise the common law powers of the office but "'shall perform such duties as may be prescribed by law.'" *Id.* at 785, 296 S.E.2d at 915 (*quoting W.Va. Const.* art. VII, § 1).[27]

■■■ Upon determining that the role of the Attorney General "is not to make public policy in his own right on behalf of the state[,]" but rather "to exercise his skill as the state's chief lawyer to zealously advocate and defend the policy position of the officer or agency in the litigation[,]" this Court declared there to be a traditional attorney-client relationship between the Attorney General and the state officer he represents. *Id.* at 790, 296 S.E.2d at 920. *See State ex rel. Caryl v. MacQueen*, 182 W.Va. 50, 385 S.E.2d 646 (1989). Accordingly, "[t]he Attorney General has the duty to conform his conduct to that prescribed by the rules of professional ethics." Syl. pt. 4, *Manchin, supra*.

Furthermore, "[a]s a lawyer and an officer of the courts of this state, the Attorney General is subject to the rules of this Court governing the practice of law and the conduct of lawyers[.]" *Id.* at syl. pt. 5, in part. The Attorney General is thus required to conform his actions to the *Rules of Professional Conduct*, as is every lawyer in this State. *Id.* *See* Preamble, *Rules of Professional Conduct* at 537. ("Every lawyer is responsible for

observance of the Rules of Professional Conduct.")[28]

This Court has previously observed that "'[a]n attorney who is a public official is held to a high standard of conduct because of his or her (1) professional and (2) public trustee responsibilities.'" *Committee on Legal Ethics v. Roark*, 181 W.Va. 260, 265, 382 S.E.2d 313, 318 (1989) (*citing Graf v. Frame*, 177 W.Va. 282, 288, 352 S.E.2d 31, 38 (1986)). Furthermore, "'"[l]awyer insensitivity to ethical impropriety [or perceived ethical impropriety] is one of the primary sources of this lack of public confidence in the Bar. The problem is exacerbated when ethical violations are committed by an attorney holding an important public office."'" *Roark*, at 265, 382 S.E.2d at 318 (*quoting Graf*, at 289, 352 S.E.2d at 38 and *Sanders v. Mississippi State Bar Ass'n.*, 466 So.2d 891, 893 (Miss.), *cert. denied*, 474 U.S. 844, 106 S.Ct. 133, 88 L.Ed.2d 109 (1985) (emphasis omitted)).[29]

Respondent agrees that the Attorney General must conform his conduct to the *Rules of Professional Conduct*. However, he proposes that, in some instances, the Rules apply differently to the Attorney General than to a lawyer representing a private litigant. Respondent maintains that, as an elected official, he has a constitutional duty to act as a "servant of the people" and that this duty takes precedence over the *Rules of Professional Conduct*. *See W.Va. Const.* art. III, § 2.

■■■ We see no conflict between respondent's duty as a servant of the public and his ethical duty of confidentiality under Rule 1.6(a) of the *Rules of Professional Conduct*. *See State ex rel. Caryl, supra; Rules of Professional Conduct* 1.6 cmt. ("The re-

---

**26.** Then Justice McGraw authored the *Manchin* opinion during his tenure as Justice of this Court.

**27.** We came to this conclusion after tracing the ancient origins of the office. *Id.* at 783–787, 296 S.E.2d at 913–17. Among the "duties ... prescribed by law" are those articulated in *W.Va. Code*, 5–3–1 [1994] and 5–3–2 [1987], which, *inter alia*, designate the Attorney General to be the legal adviser to state officers sued in their official capacities. *Id.* at 787–89, 296 S.E.2d at 917–18.

**28.** The *Manchin* case resulted from a petition for a writ of mandamus and not a lawyer disciplinary proceeding. Thus, there were no allegations that any particular ethical rules were violated.

**29.** *See Committee on Legal Ethics v. Karl*, 192 W.Va. 23, 449 S.E.2d 277 (1994) (imposing three-month suspension upon sitting circuit judge for ethical violations which occurred during his practice of law); *Roark, supra* (imposing three-year suspension upon city mayor, and former prosecuting attorney, following guilty plea on drug charges.)

quirement of maintaining confidentiality of information relating to representation applies to government lawyers who may disagree with the policy goals that their representation is designed to advance.") A lawyer's relationship to the people " 'is one of high responsibility, involving complete trust and confidence and absolute fidelity to integrity.' " *McCain*, 330 So.2d at 714 (citation omitted). Such responsibility is clearly consistent with respondent's function as the Attorney General of the state. To conclude otherwise would serve to denigrate the legal profession and destroy the public's trust and confidence in the entire judicial system.

## V.

██ The Office of Disciplinary Counsel objects to the Lawyer Disciplinary Board's finding that respondent did not violate Rule 1.2(a) of the *Rules of Professional Conduct* when he moved to withdraw as counsel for the DEP. *See Charge Three, supra.* Rule 1.16 of the *Rules of Professional Conduct* permits a lawyer to withdraw from representing a client if such withdrawal "can be accomplished without material adverse effect on the interests of the client[.]" Rule 1.16(b). The Board found there to be no contention that respondent's attempted withdrawal prejudiced the DEP. This finding is supported by reliable, probative and substantial evidence on the whole record. *McCorkle, supra.*

Similarly, we agree with the Board's finding that the Office of Disciplinary Counsel failed to prove that respondent encouraged Ms. Hogbin to apply pressure to legislators as a means of opposing the DEP's decision to support LCS' Rule 59(e) motion, as alleged in Charge Two. We further agree with the Board's dismissal of Charge Four, based upon the evidence that it was Assistant Attorney General Adams, and not respondent, who attached a copy of an in-house legal memorandum to the Office of Attorney General's motion to withdraw.

## VI.

██ Finally, the Lawyer Disciplinary Board has recommended that respondent be publicly reprimanded, pursuant to Rule 3.15 of the Rules of· Lawyer Disciplinary Procedure. We agree with this portion of the Board's recommended discipline, despite the Office of Disciplinary Counsel's objection. We conclude that respondent's violation of Rule 1.6(a) of the *Rules of Professional Conduct* does not warrant a three-month suspension from the practice of law, as Disciplinary Counsel argues:

> ' " 'This Court is the final arbiter of legal ethic problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law.' Syl. Point 3, *Committee on Legal Ethics v. Blair*, [174] W.Va. [494], 327 S.E.2d 671 (1984)." Syl. pt. 1, *Committee on Legal Ethics v. Charonis*, 184 W.Va. 268, 400 S.E.2d 276 (1990).' Syl. pt. 1, *Committee on Legal Ethics v. Ikner*, 190 W.Va. 433, 438 S.E.2d 613 (1993).

Syl. pt. 7, *Karl, supra.*

Accordingly, we order that respondent be publicly reprimanded.

The Board has further recommended that respondent pay $4,430.55 for the costs incurred by the Office of Disciplinary Counsel in connection with this disciplinary proceeding. We shall not adopt this recommendation.

According to the itemized certificate of expenses submitted by the Office of Disciplinary Counsel, the amount of $2,716.99 was incurred in attorney fees in the case of *In re: State ex rel. Darrell V. McGraw, Jr. v. The Committee on Legal Ethics of The West Virginia State Bar and Sherri D. Goodman*, Civil Action No. 94–Misc.–177, a petition for a writ of mandamus seeking, *inter alia*, a suspension of all proceedings against respondent until the Committee on Legal Ethics and its counsel, Ms. Goodman, properly investigated the complaint filed against him.[30] We find that respondent is not responsible

---

**30.** The Circuit Court of Kanawha County subsequently granted motions on behalf of the Committee and Ms. Goodman to strike the petition for writ of mandamus and to dismiss the proceeding and related rule to show cause.

for the costs incurred by the Office of Disciplinary Counsel in connection with this collateral proceeding. Accordingly, respondent is ordered to pay $1,713.56.

## VII.

For the reasons stated herein, we conclude that respondent violated Rule 1.6(a) of the *Rules of Professional Conduct* when he disclosed client information. We, therefore, order that respondent be publicly reprimanded and pay $1,713.56 for the costs incurred for this disciplinary proceeding.

Public Reprimand Plus Costs.