No. 13-0544 - <u>Lawyer Disciplinary Board v. Hussell</u>

**FILED**

**November 25, 2014**
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

LOUGHRY, Justice, dissenting:

This Court's faithful and consistent oversight of lawyer disciplinary matters is among the highest duties owed to the citizens of the State of West Virginia. Yet in a virtually unprecedented decision, the majority dismissed charges and resulting sanctions against a lawyer *who had expressly consented to the recommended sanctions* made by the Hearing Panel Subcommittee ("HPS"). To be clear, Mr. Hussell did not come before this Court asking to have the findings of the HPS or its recommended sanctions set aside. In fact, Mr. Hussell requested in his brief "*that the recommended sanctions be imposed*[.]" (emphasis added). To reach its unwarranted result, the majority completely disregards the factual findings made by the HPS–the body charged with making those factual determinations–and casually discards the implications of Mr. Hussell's consent to the recommended disposition. The majority's result-oriented opinion is nothing more than a work of fiction that will assuredly send a message that this Court is more interested in *protecting* its own than *policing* its own. The image of the West Virginia legal system will once again be sullied as ethical considerations are cast aside along with any concerns for protecting the public.

This Court's standard of review in disciplinary matters requires plenary review

1

of "questions of law, questions of application of the law to the facts, and questions of appropriate sanctions[.]" Syl. Pt. 2, in part, *Lawyer Disciplinary Bd. v. McGraw*, 194 W.Va. 788, 461 S.E.2d 850 (1995). "On the other hand, *substantial deference* is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record." *Id.* (emphasis supplied). The lone factual issue presented in this case, and resolved by the HPS, was whether James L. terminated the attorney-client relationship that he and his wife, Carolyn L., had with Mr. Hussell during their conversation of January 10, 2010. If he did not, then Mr. Hussell's subsequent actions relative to his sexual relationship with Carolyn L. violated various Rules of Professional Conduct. The HPS concluded that the attorney-client relationship was *not* terminated during that conversation. Without question, this conclusion was supported by "reliable, probative, and substantial evidence," all of which was conveniently ignored by the majority.

In addition to the fact that James L. and Carolyn L. each signed a consent to joint representation *after* the January 10, 2010, conversation, they both testified that the attorney-client relationship continued following this conversation. Carolyn L. testified before the HPS, as follows:

> Q. And what did you believe that meant when you signed this [joint representation] letter on January 14th of 2010?
>
> A. That he was going to continue to represent [James L.].
> . . . .
> Q. In what way would that [sexual relationship] have hurt his job?

2

> A.   Because at the time technically he was our attorney so I
>      was just worried.  I didn't want it to hurt his career.

Completely ignoring the foregoing, the majority cites an isolated statement from Carolyn L.'s testimony to contend that Carolyn L. did not believe an attorney-client relationship existed. The majority looked to her explanation that she "didn't really think of [Mr. Hussell] as an attorney.  I just thought of him as my friend."  This single statement, which was seized upon by the majority to justify its result, has literally nothing to do with whether there was an attorney-client relationship.

Of more import is the fact that James L. clearly expressed to Mr. Hussell during their January 10, 2010, conversation that he had yet to obtain alternate counsel and, subsequently, James L. explained that he signed the joint representation document to cover any additional work Mr. Hussell might perform while he was searching for substitute counsel:

> Q.   What was your intention on signing this on January 14th,
>      2010, then?
>
> A.   . . . . because I didn't have an estate planner at that point.
>      So I didn't know if he was going to do some more work
>      for us and then send that to us . . . .

To whatever extent the foregoing does not plainly express James and Carolyn L.'s belief that Mr. Hussell was still their attorney pending their search for a new one, James L. testified: "I still thought he was my attorney, though.  I mean the thing is he said he was going to do

3

my estate."

The majority has selectively adopted its own view of the vague descriptions of the January 10, 2010, conversation to determine that a "clear" termination of the attorney-client relationship occurred. The majority does so without a hint of discussion about the somewhat obvious, yet well-articulated premise, that whether an attorney-client relationship has been terminated is a question for the fact-finder. "[T]he question of when an attorney-client relationship for a particular undertaking or transaction has terminated is necessarily one of fact." *Omni-Food & Fashion v Smith*, 528 N.E.2d 941, 944 (Ohio 1988); *see Ruf v. Belfance*, 2013 WL 243992, at *3 (Ohio Ct. App. Jan. 23, 2013) ("Generally, the determination of whether an attorney-client relationship has ended is a factual question to be resolved by the trier of fact."); *Mobberly v. Hendricks*, 649 N.E.2d 1247, 1249 (Ohio Ct. App. 1994) (citations omitted) ("In determining when the attorney-client relationship is terminated, the court must point to an affirmative act by either the attorney or the client that signals the end of the relationship. For a trial court to take this issue away from a jury, such an act must be clear and unambiguous."); *Bee v. McNamara*, 2006 WL 895014, at *1 (Conn. Super. Ct. Mar. 23, 2006) (finding that genuine issue of fact precluded determination as to whether client effected de facto termination of his relationship with defendant); *McGehee v. Johnson*, 2006 WL 3019823, at *3 (Mich. Ct. App. Oct. 24, 2006) ("Although a formal discharge is not required to terminate an attorney-client relationship, any claim that plaintiff impliedly terminated the relationship raises additional factual issues.").

4

The majority has elevated the expressions of distrust made by James L. to Mr. Hussell during their January 10, 2010, conversation and wholly ignored the remainder of the evidence as to what was conveyed in that conversation. James L. testified that during this conversation he stated:

> I'm uncomfortable with the phone calls and your relationship with my wife, and I think in terms of my estate I really have to look after my children and make sure that they have an iron clad estate so people can't come back and find holes and gaps. . . . I have talked to Ditsy Keightley at BB&T and she said she could probably find me another estate planner.

Mr. Hussell did not disagree with this characterization of their conversation, testifying that "the facts are basically as he [James L.] relayed it." Mr. Hussell testified that James L. advised him that "he was uncomfortable with my representation of him. He had contacted Ditsy and was going in a different direction." Critically, however, "[w]hile a lack of trust may lead to the termination of the attorney-client relationship, that lack of trust and confidence does not necessarily signal termination of the relationship." *Thayer v. Fuller & Henry, Ltd.*, 503 F. Supp. 2d 887, 892 (N.D. Ohio 2007); *see R. E. Holland Excavating, Inc. v. Martin, Browne, Hull & Harper, P.L.L.*, 833 N.E.2d 1273, 1276 (Ohio Ct. App. 2005) (holding that "lack of trust and confidence does not constitute the termination of the [attorney-client] relationship"); *Ruf,* 2013 WL 243992, at *3 ("The termination of the attorney-client relationship depends, not on a subjective loss of confidence on the part of the client, but on conduct, an affirmative act by either the attorney or the client that signals the end of the relationship." (quoting *Mastran v. Marks*, 1990 WL 34845 (Ohio Ct. App. Mar.

5

28, 1990))); *McOwen v. Zena,* 2012 WL 4714038 (Ohio Ct. App. Sept. 27, 2012) (finding that letter by client to attorney equivocally informing him that she intended to terminate him as her attorney did not terminate the attorney-client relationship).

In a half-hearted effort to "reverse engineer" a termination of the attorney-client relationship necessary to vacate the disciplinary charges, the majority identifies three utterly illogical factors to support its position that the attorney-client relationship had been terminated. The majority states that it "finds probative" the fact that Mr. Hussell performed no work after January 10, 2010; that neither James nor Carolyn L. asked him to perform work after that date; and that Mr. Hussell did not "signify his acceptance" of the joint representation letter. The majority ignored the strongest and most obvious evidence that James and Carolyn L. believed that Mr. Hussell continued to be their attorney–as reflected by their *signing and returning the joint representation agreement* after January 10, 2010. The fabricated determinants cited by the majority illogically suggest that an attorney must perform perpetual services for all clients, without pause, lest the attorney-client relationship be deemed to have ended. Moreover, it suggests that a client must constantly demand updates and further services for fear that any lull in the relationship may be construed as a termination sufficient to allow the attorney to violate their interests and trust. Finally, the suggestion that an attorney who sends out a joint representation agreement that is then accepted and signed by the clients must thereafter "accept the acceptance" is ludicrous and

6

deserves no further comment.[1]

As noted above, the majority's dismissal of the sanctions to which Mr. Hussell had consented is *virtually* unprecedented. Unfortunately, however, this is not the first occasion the majority has taken such an inexplicable position. In *Lawyer Disciplinary Board v. Jarrell*, 206 W.Va. 236, 523 S.E.2d 552 (1999), a narrow majority of the Court dismissed charges against a prosecuting attorney after she consented to admonishment for the charges. In that case, the Court noted that only in "rare instances" may there be "extraordinary mitigating circumstances" which would justify its dismissal of agreed-upon sanctions. *Id.* at 244, 523 S.E.2d at 560. In a strongly worded dissent, Justice Davis bemoaned the "uncertainty" created by the majority's "unwillingness[] to accept recommended dispositions which are consented to by the parties." *Id.* Justice Davis found there was "no justifiable reason for [the] Court to have refused to adopt the recommended decision of the HPS, which was consented to by [the respondent]." *Id.* at 245, 523 S.E.2d at 561. As Justice Davis aptly noted, the majority's disregard of the respondent's consent to the disposition simply "created more embarrassment and humiliation for [the respondent] by etching the details of her ethical violations forever in the law reporters of this State. This undoubtedly was something she was hoping to avoid by voluntarily consenting to [the disposition]." *Id.* As was the case in

---

[1]Additionally, the majority's reliance on Mr. Hussell's purported "reasonable belief" that he had been fired is completely incorrect. *United States v. Dennis*, 843 F.2d 652, 657 (2d Cir. 1988) ("The key . . . to whether an attorney/client relationship existed is the intent of the client[.]").

7

*Jarrell*, Mr. Hussell's decision to consent to the recommended disposition of the HPS was likely impelled by a desire to minimize negative publicity, accept the consequences of his actions, and move forward with the rest of his professional life.

In short, the majority has performed a disservice to both the rule of law and Mr. Hussell. Accordingly, I respectfully dissent.